COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Bumgardner
Argued at Richmond, Virginia


JAMES EDWARD HARRIS, JR.
                                        OPINION BY
v.        Record No. 0955-97-2      JUDGE LARRY G. ELDER
                                        JUNE 16, 1998
COMMONWEALTH OF VIRGINIA

            FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
                    William H. Ledbetter, Jr., Judge

            James J. Ilijevich (Office of the Public
            Defender, on brief), for appellant.

            Steven A. Witmer, Assistant Attorney General
            (Richard Cullen, Attorney General, on brief),
            for appellee.


     James E. Harris, Jr. (appellant) appeals his conviction of

possession of cocaine in violation of Code § 18.2-250.  He

contends the trial court erred when it (1) denied his motion to

suppress evidence obtained during a traffic stop of a car in

which he was a passenger and (2) admitted into evidence a police

officer's testimony regarding out-of-court statements made by the

car's driver.  For the reasons that follow, we affirm.

                                I.

                              FACTS

     The evidence in the record, when viewed in the light most

favorable to the Commonwealth, proved that, on June 7, 1996,

Trooper John A. Jones of the State Police was patrolling

Interstate 95 in a marked police cruiser.  At around 11:00 a.m.,

Trooper Jones noticed a vehicle that was both speeding and making

improper lane changes. The car was driven by Tony Maurice Horne, and appellant was a passenger in the front seat. Trooper Jones stopped the vehicle. As Trooper Jones exited his cruiser, appellant opened the passenger side door and leaned over as if he was reaching for something. Appellant then exited the vehicle, appeared "nervous and jittery," and took "a step or two" in the direction of Trooper Jones' cruiser. Trooper Jones, who by this time had exited his cruiser, commanded appellant to stay where he was and to show his hands. When appellant failed to comply with the trooper's request, Trooper Jones drew his weapon, pointed it at appellant, and again ordered him to show his hands. Appellant continued moving around and did not display his hands to Trooper Jones.

"Less than a minute" after Trooper Jones first ordered appellant to show his hands, Trooper Scott Luddy arrived at the scene. Shortly after Trooper Luddy's arrival, Trooper Jones put away his weapon. Trooper Luddy approached appellant, told him to "calm down," and escorted him to the side of the vehicle. Trooper Luddy neither drew his weapon nor pushed appellant to the side of the car. At this point, Trooper Jones walked over to the driver side of the vehicle to investigate whether Horne, the operator, was driving under the influence.

Trooper Luddy remained with appellant. Appellant appeared agitated and continued shifting his weight back and forth and moving his hands. At about this time, Trooper Paul D. Watts

-2-

arrived at the scene and approached Trooper Luddy and appellant. Appellant continued to fidget and appeared excited and argumentative. Trooper Watts, who was qualified as an expert in drug investigations and drug paraphernalia, testified that, based on appellant's demeanor and behavior, he believed appellant was "high on crack." According to Trooper Watts, appellant was neither free to turn around nor to leave.

Appellant consented to Trooper Luddy's request to conduct a pat-down of appellant's clothing. During the pat-down, Trooper Luddy felt a "pipe-like device" in appellant's front pocket. One of the troopers asked appellant to retrieve the object from his pocket, and appellant complied. Appellant pulled out a corn cob pipe and handed it to Trooper Luddy. Trooper Watts examined the pipe and concluded it was a "crack pipe" because it contained metal meshing typical of such pipes.

After examining the pipe, Trooper Watts asked appellant a series of questions. Trooper Watts asked appellant if he used the pipe to "smoke crack." Appellant replied that he did not smoke crack cocaine. Trooper Watts then asked appellant where his tobacco was located. Appellant replied that it was in the car and offered to show it to the trooper. Appellant entered his car and retrieved a pouch from the front seat. When appellant opened the pouch, Trooper Watts saw a clear vial with a green cap that is typically used to store illegal drugs. The vial was "sitting right on top of the tobacco." Trooper Watts watched as

appellant manipulated the tobacco in the pouch until it covered the vial. Appellant then said, "this is my tobacco" and handed the pouch to Trooper Watts. Trooper Watts recovered the vial from the bottom of the pouch. The vial contained crack cocaine. Within minutes of this discovery, at 11:20 a.m., Trooper Watts arrested appellant and placed him in handcuffs. Six minutes later, Trooper Watts first informed appellant of his <u>Miranda</u> rights.

After a grand jury indicted appellant for possessing cocaine in violation of Code § 18.2-250, appellant moved the trial court to suppress the cocaine retrieved by Trooper Watts. Following a hearing, the trial court made extensive factual findings and denied appellant's motion.

At trial during the Commonwealth's case-in-chief, Trooper Jones testified about an exchange he had with the driver, Horne, after the trooper learned that crack cocaine had been retrieved from appellant. Trooper Jones testified that he asked Horne what he knew about "the crack in the car." Trooper Jones testified that Horne made the following statement: "We went together to buy it last night so we could give it to some whores for sex, but we didn't use any." Trooper Jones also testified that Horne stated that he and appellant intended to use the remaining amount to "get a bitch when we get to the beach." Appellant objected to the admission of Horne's out-of-court statements on the ground they were inadmissible hearsay. The trial court overruled

appellant's objection.

Following the presentation of the evidence, the trial court found appellant guilty of possession of cocaine. During its ruling from the bench, the trial court stated that it would not consider Horne's out-of-court statements when determining appellant's guilt. The trial court subsequently sentenced appellant to serve three years in prison with all but ninety days suspended.

## II.

### MOTION TO SUPPRESS

Appellant contends the trial court erred when it denied his motion to suppress. First, appellant argues the trial court erred when it concluded he was lawfully detained after he exited the vehicle. Second, appellant argues Trooper Watts subjected him to custodial interrogation before he was given his Miranda warnings and that his subsequent responses to this unlawful interrogation resulted in the discovery of the crack cocaine in the tobacco pouch. We disagree with both contentions.

On appeal from a trial court's denial of a motion to suppress, the burden is on the appellant to show that the trial court's decision constituted reversible error. See Stanley v. Commonwealth, 16 Va. App. 873, 874, 433 S.E.2d 512, 513 (1993). We view the evidence in the light most favorable to the prevailing party, granting to it all reasonable inferences fairly deducible therefrom. See Commonwealth v. Grimstead, 12 Va. App.

1066, 1067, 407 S.E.2d 47, 48 (1991).  We review the trial court's findings of historical fact only for "clear error," but we review de novo the trial court's application of defined legal standards to the particular facts of a case.  See Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996); see also Ornelas v. United States, 517 U.S. 690, 697 (1996).

                                  A.

We first hold that appellant was not unlawfully detained by the troopers after he exited the vehicle.

It is well established that "stopping an automobile and detaining its occupants constitute a seizure within the meaning [of the Fourth Amendment] even though the purpose of the stop is limited and the resulting detention quite brief."  Delaware v. Prouse, 440 U.S. 648, 653 (1979) (citations omitted).

> A police officer may stop the driver or
> occupants of an automobile for investigatory
> purposes if the officer has "a reasonable
> articulable suspicion, based on objective
> facts, that the individual is involved in
> criminal activity."

Jones v. Commonwealth, 24 Va. App. 519, 522, 484 S.E.2d 125, 126 (1997) (citations omitted).  Following a lawful traffic stop, the Fourth Amendment permits the police to order the passengers to get out of the car pending the completion of the stop.[1]  See

---

[1]At such traffic stops, the police may also order the driver to exit the car.  See Pennsylvania v. Mimms, 434 U.S. 106, 111

-6-

<u>Maryland v. Wilson</u>, 117 S. Ct. 882, 886 (1997).  Although the United States Supreme Court has yet to address the issue, <u>see</u> <u>id.</u> at 886 n.3, this Court has previously held that police officers may also detain passengers beside an automobile until the completion of a lawful traffic stop.  <u>See</u> <u>Hatcher v. Commonwealth</u>, 14 Va. App. 487, 491-92, 419 S.E.2d 256, 259 (1992).  This authority over passengers at a lawful traffic stop is deemed a "reasonable" seizure under the Fourth Amendment because the "weighty [public] interest in officer safety" during traffic stops, which "may be dangerous encounters," sufficiently outweighs the minimal additional intrusion upon the private interests of passengers, who "are already stopped by virtue of the [lawful] stop of the vehicle."  <u>Wilson</u>, 117 S. Ct. at 885-86; <u>see also</u> <u>Hatcher</u>, 14 Va. App. at 490-92, 419 S.E.2d at 258-59.

When the troopers detained appellant, they acted reasonably, as required by the Fourth Amendment, to protect their safety and maintain the status quo during the course of the investigatory traffic stop.  Trooper Jones lawfully stopped the vehicle for investigatory purposes after observing Horne drive the car in excess of the speed limit and make improper lane changes.  After appellant exited the car and failed to comply with Trooper Jones' order to show his hands, Trooper Jones drew his gun upon appellant.  This show of authority effectively prevented appellant from leaving the scene of the traffic stop.  Troopers

n.6 (1977).

-7-

Luddy and Watts arrived within minutes and detained appellant at the front of the car while Trooper Jones investigated Horne. Although appellant was initially detained beside the car through the display of a drawn weapon rather than, as in <u>Hatcher</u>, by a verbal show of authority, appellant's detention by this means was reasonable under the circumstances and lawful under the Fourth Amendment. <u>See</u> <u>Hatcher</u>, 14 Va. App. at 489, 491-92, 419 S.E.2d at 257, 259. During <u>Terry</u> stops, the police are permitted to use methods of restraint that are reasonable under the circumstances. <u>See</u> <u>Thomas v. Commonwealth</u>, 16 Va. App. 851, 857, 434 S.E.2d 319, 323 (1993), <u>aff'd en banc</u>, 18 Va. App. 454, 444 S.E.2d 275 (1994). Trooper Jones' display of his firearm for less than a minute prior to the arrival of the other troopers was a reasonable response to appellant's failure to show his hands while moving in the trooper's direction.

B.

We also hold that Trooper Watts did not unlawfully interrogate appellant because appellant was not "in custody" prior to his formal arrest, which occurred <u>after</u> the crack cocaine was discovered in the tobacco pouch.

In order to protect the privilege against compelled self-incrimination guaranteed by the Fifth Amendment against the "inherently compelling pressures" of custodial interrogation, "which work to undermine the individual's will to resist and . . . compel him to speak where he would otherwise not do so

-8-

freely," the United States Supreme Court established the procedural safeguards enumerated in Miranda v. Arizona, 384 U.S. 436, 467 (1966).  "[I]f the police take a suspect into custody and then ask him questions without informing him of the rights enumerated [in Miranda], his responses cannot be introduced into evidence to establish his guilt."  Berkemer v. McCarty, 468 U.S. 420, 429 (1984).  However, "police officers are not required to administer Miranda warnings to everyone whom they question," and Miranda warnings are not required when the interviewee's freedom has not been so restricted as to render him or her "in custody." Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

> Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.

Berkemer, 468 U.S. at 437.  Although a person temporarily detained pursuant to an "ordinary traffic stop[]" is not "in custody" for the purposes of Miranda, a detained motorist will be entitled to the protections set forth in Miranda if he or she "thereafter is subjected to treatment that renders him 'in custody' for practical purposes."  Id. at 440.

Whether a suspect is "in custody" under Miranda is determined by the circumstances of each case, and "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983)

(citation omitted).  The determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  Stansbury v. California, 511 U.S. 318, 323 (1994).

 If a reasonable person in the suspect's position would have understood that he or she was under arrest, then the police are required to provide Miranda warnings before questioning.  See Cherry v. Commonwealth, 14 Va. App. 135, 140, 415 S.E.2d 242, 244-45 (1992); see also Stansbury, 511 U.S. at 325 (indicating that the objective circumstances "are relevant to the extent they would affect how a reasonable person in the position of the individual being questioned" would perceive his or her freedom to leave).  Among the circumstances to be considered when making the determination of whether a suspect was "in custody" are (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual.[2]  See Bosworth v. Commonwealth, 7 Va. App. 567,

---

[2]This last factor encompasses the degree to which it was conveyed to the suspect that he or she was the focus of a criminal investigation and includes circumstances such as the appearance of probable cause to arrest and the extent to which the individual is confronted with evidence of guilt.  In Stansbury, the United States Supreme Court clarified the role that this factor plays in the overall analysis of whether a suspect was "in custody."  The Court stated:

572, 375 S.E.2d 756, 759 (1989); Lanier v. Commonwealth, 10 Va. App. 541, 554, 394 S.E.2d 495, 503 (1990); see also Stansbury, 511 U.S. at 324-25.  No single factor is dispositive of the issue.  See Wass v. Commonwealth, 5 Va. App. 27, 33, 359 S.E.2d 836, 839 (1987).

> It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda.  The same principle obtains if an officer's undisclosed assessment is that the person questioned is not a suspect.  In either instance, one cannot expect the person under interrogation to probe the officer's innermost thoughts.  Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry.
>
> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.  Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gage the breadth of his or her "'freedom of action.'"  Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.  The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.

Stansbury, 511 U.S. at 324-25 (citations omitted).

Regarding the degree of physical restraint, "[t]here is no 'litmus-paper test for distinguishing . . . when a seizure exceeds the bounds of an investigative stop.'" DePriest v. Commonwealth, 4 Va. App. 577, 586, 359 S.E.2d 540, 544 (1987) (quoting Florida v. Royer, 460 U.S. 491, 506 (1983)).  Terry stops are not distinguished from custodial interrogation by the absence of any restriction upon the suspect's liberty.  See United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995).  Indeed, a brief but complete restriction of a suspect's liberty is valid under Terry, and the police are permitted to use methods of restraint that are reasonable under the circumstances.  See Thomas, 16 Va. App. at 857, 434 S.E.2d at 323.

> [D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes.

Leshuk, 65 F.3d at 1109-10.  Rather, "Terry stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion."  Id. at 1109.

The record indicates that appellant's encounter with the troopers occurred on the side of a busy interstate highway in broad daylight and lasted about twenty minutes.  Trooper Jones had his weapon drawn upon appellant for "less than a minute" before Trooper Luddy arrived and escorted appellant to the side of the car.  Appellant waited with Trooper Luddy for the next

-12-

several minutes while Trooper Jones investigated Horne. Appellant was not handcuffed, although he was ordered to place his hands on the hood of the car, and was not free to leave. Trooper Luddy did not ask appellant any questions. After Trooper Watts arrived, appellant consented to a pat-down search of his clothing, voluntarily removed the pipe from his pocket, and gave it to the troopers. At this point, a reasonable person in appellant's position would have believed he or she was the focus of Trooper Watts' investigation to confirm or dispel his suspicions that the person so-detained was engaged in criminal activity involving illegal drugs.

The record indicates that Trooper Watts' questioning lasted no longer than a few minutes. Until Trooper Watts retrieved the vial of crack cocaine from the tobacco pouch at the <u>conclusion</u> of the questioning, appellant was not confronted with any evidence, with the possible exception of the corn cob pipe he voluntarily displayed, indicating that he was guilty of possessing crack cocaine. Moreover, it was apparent that probable cause did not exist to arrest appellant until after Trooper Watts retrieved the vial. Significantly, appellant was formally arrested and informed of his <u>Miranda</u> rights within minutes after Trooper Watts' discovery of the crack cocaine. With the exception of Trooper Jones' service revolver, no other weapons were drawn prior to the time appellant received his <u>Miranda</u> warnings, and appellant was not told he was under arrest prior to Trooper

Watts' questioning.

We conclude that appellant was not entitled to <u>Miranda</u> warnings prior to the questioning by Trooper Watts that led to the discovery of the cocaine.  At the time of Trooper Watts' questioning, appellant's detention had been transformed from one whose purpose was to protect officer safety and maintain the status quo during a traffic stop to a <u>Terry</u> stop whose purpose was to investigate appellant for suspected drug-related criminal activity.  However, the means employed by the troopers to detain appellant were reasonable under the circumstances, and the entirety of the brief exchange between appellant and Trooper Watts occurred within the time "necessary to verify or dispel the officer's suspicion."  <u>Leshuk</u>, 65 F.3d at 1109.  The nature of appellant's public encounter with the troopers in broad daylight was not so "police-dominated" that a reasonable person would have felt "completely at the mercy of the police."  <u>Berkemer</u>, 468 U.S. at 438-39.  Moreover, the existence of minimal inculpatory evidence to confirm Trooper Watts' suspicions during the entirety of the questioning fostered a reasonable expectation that the detention would be temporary and brief.  Under these circumstances, we cannot say a reasonable person in appellant's position would have believed that his encounter with the troopers had escalated from an investigative detention to an arrest during the time Trooper Watts questioned appellant.

III.

ADMISSION OF HORNE'S OUT-OF-COURT STATEMENTS

Appellant next contends the trial court erred when it admitted the out-of-court statements of Horne.  We disagree.

Assuming the trial court erred when it admitted Horne's statements, we hold that this error was harmless.  A non-constitutional error, such as the erroneous admission of evidence, is harmless "when it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached."  Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (quoting Code § 8.01-678).

> [A] criminal conviction must be reversed unless "it plainly appears from the record and the evidence given at the trial that" the error did not affect the verdict.  An error does not affect a verdict if a reviewing court can conclude, without usurping the [trial court's] fact finding function, that, had the error not occurred, the verdict would have been the same.

Id.

In this case, it plainly appears from the record that the admission of Horne's out-of-court statements did not affect the trial court's determination of appellant's guilt or his sentence.  During its ruling from the bench regarding appellant's guilt, the trial court stated:

> I let that [Horne's statements] in. . . . But I'm going to ignore that, I'm going to set that aside and not take that into consideration.

It then concluded that appellant's knowledge of the cocaine in

-15-

the tobacco bag could be inferred from evidence independent of

Horne's statements, and this finding is supported by the record.

> A judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments and to separate, during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both.

Eckhart v. Commonwealth, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981).  Although we will not assume a judge has disregarded inadmissible evidence when the judge's rulings indicate otherwise, see Wilson v. Commonwealth, 16 Va. App. 213, 223, 429 S.E.2d 229, 235-36, aff'd en banc, 17 Va. App. 248, 436 S.E.2d 193 (1993), the trial court's comments indicate that, despite its initial ruling to admit Horne's hearsay statements, it disregarded this evidence.

For the foregoing reasons, we affirm the conviction of possession of cocaine in violation of Code § 18.2-250.

Affirmed.

Benton, J., dissenting.

I would hold that the scope of the detention exceeded a Terry stop and that the ensuing questioning constituted custodial interrogation for Miranda purposes. A reasonable person, who was detained in the manner James E. Harris, Jr., was detained, would have believed he or she was "in custody" prior to the time the officers questioned Harris about the corn cob pipe found in his pocket.

"[S]topping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of [the Fourth Amendment] even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A person "who has been detained pursuant to a traffic stop [and is] thereafter . . . subjected to treatment that renders him 'in custody' for practical purposes, [is] entitled to the full panoply of protections prescribed by Miranda." Berkemer v. McCarty, 468 U.S. 420, 440 (1984). The seizure becomes custodial for purposes of Miranda whenever the person has his or her "freedom of action . . . curtailed to a 'degree associated with formal arrest.'" Id. (citation omitted).

Furthermore, whether a person is "in custody" within the meaning of Miranda turns upon "how a reasonable [person] in the suspect's position would have understood his situation." Id. at 442. "Thus, a suspect is 'in custody' when the objective circumstances would lead a reasonable person to believe he was

under arrest, thereby subjecting him or her to pressure impairing the free exercise of the privilege against self-incrimination." Cherry v. Commonwealth, 14 Va. App. 135, 140, 415 S.E.2d 242, 245 (1992). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

> Among the factors that must be considered are whether a suspect is questioned in familiar or neutral surroundings, the number of police officers present, the degree of physical restraint, and the duration and character of the interrogation. Whether or when probable cause to arrest exists and when the suspect becomes the focus of the investigation are relevant facts to consider. "[T]he language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual" may be significant factors as well.

Wass v. Commonwealth, 5 Va. App. 27, 32-33, 359 S.E.2d 836, 839 (1987) (citations omitted).

The traffic stop occurred at 11:00 a.m. on a heavily travelled interstate highway. When the driver stopped the automobile, Trooper Jones exited his vehicle and yelled, "Let me see your hands." Harris opened the passenger side door, leaned down and bent forward. According to Trooper Jones, Harris appeared to be reaching under the seat, reaching outside the automobile, or reaching to drop something at the side of the

automobile. Later, Trooper Jones found a paper cup of beer on the ground next to the passenger side door. Harris admitted the beer was his.

Because Trooper Jones could not see Harris' hands, Trooper Jones drew his weapon. He pointed it in Harris' direction and repeatedly yelled, "let me see your hands." The evidence proved that the noise from the highway made hearing difficult. Harris then exited the automobile and took "maybe one or two steps" toward Trooper Jones. Trooper Jones testified that Harris was "not [acting] in a threatening manner, by any means. He just seemed very agitated in what was happening." The driver complied with Trooper Jones' order by sticking his hands out the driver's side window.

Trooper Luddy arrived and approached the automobile. As Trooper Luddy approached, Trooper Jones holstered his weapon. Trooper Luddy testified that he placed his hand on Harris' arm or shoulder and escorted Harris to the front of the automobile. However, Trooper Jones said Trooper Luddy "actually took Mr. Harris from behind and pushed him toward the [automobile]." Both agreed that Harris offered no physical resistance.

Trooper Luddy told Harris to place his hands on the hood of the automobile. When Harris placed his hands on the hood of the automobile, Trooper Luddy "had a foot probably on the inside of [Harris'] foot touching his shoe and a hand, either on [Harris'] shoulder or on his back." Harris repeatedly removed his hands

from the hood and complained to Trooper Luddy that the hood of the automobile was "hot." Although the testimony established that the stop occurred on a bright sunny day in June after the automobile had been travelling on the interstate highway, Trooper Luddy ordered Harris to keep his hands on the hot hood.

Trooper Watts then arrived and approached Trooper Luddy and Harris. When Trooper Watts arrived, Harris was leaning against the automobile with his hands on the hood. Trooper Watts testified that Trooper Luddy was repeatedly telling Harris to stand still, keep his hands on the automobile, and not to move. Trooper Watts said he told Harris the same things because Harris seemed excited and argumentative. Trooper Watts also was unresponsive to Harris' complaint that the hood of the automobile was hot. Watts did not know Trooper Jones had aimed his weapon at Harris. Trooper Watts testified that Harris was not free to turn around or to leave.

The totality of the objective circumstances in this case would lead a reasonable person in Harris' position to believe he or she was under arrest. See Cherry, 14 Va. App. at 139, 415 S.E.2d at 245. Harris was "subjected to restraints comparable to those associated with a formal arrest." Berkemer, 468 U.S. at 441. The seizure involved three police officers. The first officer drew his weapon on Harris. The second officer physically grabbed Harris, forced him to lean with his hands on the heated hood of the automobile, and restrained Harris in that position by

his commands and force. The third officer also participated in this restraint, repeating the instructions that Harris was to stand still and remain facing the automobile with his hands on the hood. Moreover, the stop in this case was not of a short duration but lasted approximately twenty minutes. See Berkemer, 468 U.S. at 441 n.34 (citing Commonwealth v. Meyer, 412 A.2d 517, 518-19, 522 (Pa. 1980) (driver who was detained for over one-half hour was in custody for the purposes of Miranda by the time the driver was questioned concerning the circumstances of an accident)). A reasonable person in Harris' position would clearly feel that he or she was unable to leave and that he or she was, in fact, "in custody." This detention was the "functional equivalent of formal arrest," Berkemer, 468 U.S. at 442, and created a custodial situation requiring appropriate Miranda warnings.

Trooper Watts testified that he asked Trooper Luddy if he had conducted a pat-down search of Harris. Trooper Luddy said that when he asked Harris if he would consent to a pat-down search of his clothing for weapons, Harris consented. Trooper Luddy testified that he felt a pipe-like device in one of Harris' front pants pockets. Trooper Watts also felt the pipe and told Harris to remove the pipe from his pocket. When Harris removed the pipe, it was "a corn cob pipe." Although Trooper Luddy testified that the pipe was one that he usually associated with marijuana, he did not detect an odor of cocaine or marijuana when

he smelled the pipe.  Indeed, the laboratory analysis reported no cocaine in the pipe.  However, Trooper Watts told Trooper Luddy the pipe was a crack pipe.

When Trooper Watts asked Harris if he had used the pipe to smoke crack, Harris responded that he did not use crack cocaine.  Trooper Watts then asked Harris where his tobacco was located.  Harris responded that the tobacco was in the automobile and asked Trooper Watts if he wanted to see the tobacco.  Harris went to the passenger side of the automobile and removed a small tobacco pouch and opened it.  According to Trooper Watts, a small clear vial with a green top was clearly visible on top of the tobacco.  Trooper Watts testified that Harris picked up a chunk of tobacco and twisted it so that the vial fell to the bottom of the pouch.  When Trooper Watts asked to see the pouch, Harris handed it to him.  Trooper Watts removed the vial, saw chunks of matter that appeared to be cocaine inside the vial, and arrested Harris.  Only then did the troopers inform Harris of his <u>Miranda</u> rights.

A person in the custody of police "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney."  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  Statements made by an accused during custodial interrogation and without proper <u>Miranda</u> warnings are inadmissible as evidence.  <u>See</u> <u>Dean v. Commonwealth</u>, 209 Va. 666, 667-68, 166 S.E.2d 228, 230 (1969).  "[C]ustodial interrogation

. . . [is] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Miranda, 384 U.S. at 444 (footnote omitted).

This is not a case where, during a routine traffic stop, "a single police officer asked [the defendant] a modest number of questions," Berkemer, 468 U.S. at 442, or where the defendant's "freedom of action was not restrained in any significant way." Cherry, 14 Va. App. at 141, 415 S.E.2d at 245.  This is also not a case where there was "no indication that [the officer] employed any physical force or engaged in any outward displays of authority that indicated that [the officer] was detaining [the defendant]." United States v. Sullivan, ___ F.3d ___, ___ (4th Cir. 1998) (no custodial interrogation where officer questioned defendant, who was seated in his own automobile throughout the dialogue, after a lawful traffic stop had ended).  Harris was subject to "custodial interrogation" at the time the troopers questioned Harris about the pipe Harris possessed.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (holding that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").  The circumstances clearly established that Harris reasonably did not feel free to decline the officer's questioning and request.

Furthermore, the circumstances certainly proved that Harris was not free to terminate the encounter.

Because Harris was not warned of his Miranda rights prior to the questioning that led to the discovery of incriminating evidence, I would hold that the statements were obtained in violation of Harris' Fifth Amendment rights and that all the evidence derived from his statements was tainted under the rule of Wong Sun v. United States, 371 U.S. 471, 488 (1963). The statements and evidence should have been suppressed.

I would also hold that the trial judge's decision to admit in evidence the driver's statement was a denial of Harris' Sixth Amendment right to confront witnesses against him. See Ohio v. Roberts, 448 U.S. 56, 66 (1980). The Commonwealth called the driver as its witness at trial. The driver denied any knowledge of the cocaine and denied seeing Harris purchase or possess the cocaine. When the Commonwealth made an oral motion "to strike the entirety of [the driver's] testimony," the trial judge granted the motion. After the driver left the courtroom, the Commonwealth proved through Trooper Jones a hearsay statement attributed to the driver.

I believe the statement was inadmissible and that the error was not harmless beyond a reasonable doubt. See Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991). For this additional reason, I would reverse the conviction.

-24-