COURT OF APPEALS OF VIRGINIA


Present:  Judges Bray, Bumgardner and Senior Judge Hodges
Argued at Chesapeake, Virginia


DAWAIN HOPKINS, S/K/A
 DAWAIN RUSSELL HOPKINS
                                    MEMORANDUM OPINION[*] BY
v.    Record No. 0502-00-1          JUDGE RICHARD S. BRAY
                                         MAY 8, 2001
COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                    Alan E. Rosenblatt, Judge

            Michael F. Fasanaro, Jr. (Abrons, Fasanaro &
            Sceviour, on brief), for appellant.

            Shelly R. James, Assistant Attorney General
            (Mark L. Earley, Attorney General, on brief),
            for appellee.


     Dawain Hopkins (defendant) entered conditional guilty pleas

in the trial court to indictments charging murder in the first

degree and conspiracy to commit murder, preserving his right to

appeal the denial of his motion to suppress certain inculpatory

statements made to police.  Accordingly, defendant maintains

before this Court that such statements were the product of a

custodial interrogation, unattended by the requisite Miranda

warnings, and erroneously admitted into evidence.  We disagree and

affirm the convictions.

---

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

The parties are fully conversant with the record, and this memorandum opinion recites only those facts necessary to a disposition of the appeal.

I.

> When a motion to suppress is reviewed on appeal, the burden is on the appellant to show that the ruling, when the evidence is considered in the light most favorable to the Commonwealth, constituted reversible error.  We review the trial court's findings of historical fact only for "clear error," but we review de novo the trial court's application of defined legal standards, such as "reasonable suspicion" and "custodial interrogation," to the particular facts of a case.

Ford v. Commonwealth, 28 Va. App. 249, 255, 503 S.E.2d 803, 805 (1998) (internal citations omitted).

Viewed accordingly, the instant record discloses that Virginia Beach Detective Shawn W. Hoffman, while investigating the disappearance of Troy Wilson, spoke with defendant's sister and learned defendant and Kevin Potts had information pertinent to the "missing person report."  Defendant's mother was privy to the conversation, and Hoffman sought and obtained her permission to speak with defendant, then age sixteen, before locating him shortly thereafter at Potts' home.

Hoffman asked defendant "if he would accompany [him] to police headquarters as we could talk with one another in regards to the disappearance of Troy Wilson," adding that his mother had authorized the interview.  Defendant replied, "he did not have a

-

problem doing that."  Prior to leaving the residence, defendant "was advised . . . that he was not under arrest" and, during the ten minute trip to headquarters, "was not restrained in any fashion" and "sat in the front seat of [the] unmarked" and unlocked police vehicle.

En route, defendant volunteered that "he had last seen" Troy Wilson "two weeks prior," when he and Potts purchased marijuana from him.  Upon arrival, Hoffman advised defendant, "we had information that he . . . and Mr. Potts [were] somehow involved . . . in the disappearance of Troy Wilson."  Defendant then "indicated . . . he would tell . . . what happened," and he and Hoffman, accompanied by Detective Byrum, proceeded to "interview room . . . 138."  Hoffman again advised defendant "he was not under arrest [and] . . . was free to leave" and began a videotaped interview at approximately 3:30 p.m.[1]

The video depicts a small, Spartan room, furnished with a table and three chairs.  Defendant and Hoffman were initially seated at opposite ends of the table but, as the interview progressed, Hoffman drew closer to defendant, moving his chair along the table.  Byrum was seated beside defendant but soon left the room and did not return.  During the interview, defendant explained to Hoffman that Potts, a close friend, had murdered Wilson, after Wilson threatened to "shoot" defendant as a result

_____

[1] The videotape was reviewed by both the trial court and this Court.

-

of an unpaid drug debt.  Defendant recalled Potts had jokingly mentioned killing Wilson to protect defendant, but insisted he did not solicit Potts to commit the crime, did not page or otherwise summon Wilson to the fatal rendezvous with Potts, and was not present during commission of the offense.  Defendant did, however, admit assisting Potts in moving and burying the corpse approximately two weeks following the murder.

As the interview progressed, defendant's fear of incarceration as a consequence of his involvement with Potts became apparent, and Hoffman's responses to defendant's related questions included "I don't know about that," "I can't guarantee anything" and "Nobody's going to Beaumont or anything."  Defendant asked, "Do I get to go home tonight?" and Hoffman answered, "We're going to see about that," and, later, "We're working on that, alright?" to a similar inquiry.  When defendant commented, "Well, I just want to go home tonight," Hoffman responded, "Okay.  Hold tight for a few minutes."  Subsequently, the following exchange occurred between defendant and Hoffman:

| | |
|---|---|
| Defendant: | But I can't leave though. |
| Hoffman: | You could leave, but I think you wanted [sic] to sit here and tell me what happened. You certainly could leave. |
| Defendant: | Yeah, but ain't gonna help me in court.  'Cause I know I'm gonna be in court for this, ain't I? |
| Hoffman: | Possibly . . . |
| Defendant: | What I'm saying, I'm going to get locked up though, huh? |

-

            Hoffman:            I don't know that.  I honestly
                               don't know that.

     After approximately forty minutes, at "about 1610 or 1615

hours," the audio/visual capability available in room 138 was

required by another officer, and the interview was relocated to

room 136.  While changing rooms, defendant was offered "anything

to eat or drink" and permitted to use the restroom, unaccompanied

and without restraint.  Hoffman and defendant then "talked about

the case a little bit more," "basically rehashing" the earlier

discussion, and defendant agreed to "accompany [Hoffman] out to [a

nearby] housing area and show [Hoffman] where he had buried the

body."

     Hoffman, Byrum and defendant traveled in an unmarked police

car, with defendant "direct[ing] . . . where to drive" while

riding, unrestrained in the front seat of the car.  On arrival,

defendant indicated the locations "where . . . Potts told him the

incident happened," he first observed Wilson's corpse "covered

with leaves," he and Potts buried Wilson and the two disposed of

the murder weapon.  Defendant walked freely to and about the area

and was once separated from the detectives by a "chain link fence

and row of bushes."

     At the conclusion of the site visits, Hoffman reminded

defendant he was not under arrest and "asked . . . if he would

accompany [them] back to police headquarters so we could continue

our interview."  Defendant agreed and, upon return to the station,

                                -

was again permitted to use the restroom, unaccompanied and unrestrained.

Returning to room 136, Hoffman inquired, "one more time[,] who actually paged Troy Wilson on the day of the murder."  In response, defendant admitted that he, not Potts, had paged Wilson, because "he knew if he got him over there that [Potts] was going to kill him."  "At that point," Hoffman recalled, defendant "asked . . . – told us he would like to go home," and Hoffman first advised him that he was "in custody and . . . not free to leave."  This final exchange occurred at approximately 6:00 p.m., and defendant was arrested for the subject offense shortly thereafter. Hoffman testified that defendant had not previously implicated himself in the murder of Wilson, "as far as actually being a principal or participant," and he had not intended to arrest defendant until he admitted summoning Wilson to the meeting with Potts, fully aware of Potts' murderous intentions.

The evidence is uncontroverted that defendant was not afforded Miranda warnings prior to arrest.

## II.

It is well established that the safeguards of Miranda pertain only to "custodial interrogation."  Pruett v. Commonwealth, 232 Va. 266, 271, 351 S.E.2d 1, 4 (1986).  In determining whether a suspect is "in custody" for Miranda purposes, "'the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with formal

-

arrest.'"  Harris v. Commonwealth, 27 Va. App. 554, 564, 500

S.E.2d 257, 262 (1998) (quoting California v. Beheler, 463 U.S.

1121, 1125 (1983) (citation omitted)).  "The situation must be

viewed from the vantage point of 'how a reasonable man in the

suspect's position would have understood his situation.'"  Wass v.

Commonwealth, 5 Va. App. 27, 32, 359 S.E.2d 836, 839 (1987)

(quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  Factors

previously identified by this Court as pertinent to resolution of

a custody issue in the context of Miranda include

> (1) the familiarity or neutrality of the
> surroundings, (2) the number of police
> officers present, (3) the degree of physical
> restraint, (4) the duration and character of
> the interrogation, (5) the presence of
> probable cause to arrest, and (6) whether
> the suspect has become the focus of the
> investigation.

Bosworth v. Commonwealth, 7 Va. App. 567, 572, 375 S.E.2d 756,

759 (1989).

Here, in ruling "that this was not a custodial

interrogation" and overruling defendant's motion to suppress his

statements, the trial court found defendant "did, in fact,

voluntarily come down to the detective bureau with Detective

Hoffman" and willingly returned following the visit to the crime

scene.  "Additionally," the court noted, defendant "was free to go

at that time" anytime and "was so advised more than once," was

permitted use of the restroom without restraint and unaccompanied

by police, and interviewed in an unlocked room.  With reference to

-

the videotape, the court commented defendant "seem[ed] to be aware of what was going on[,] . . . appeared . . . articulate, intelligent, and . . . not . . . under the . . . influence of . . . narcotics or . . . alcohol."

Guided by the factors relevant to resolution of the custody issue and the findings of fact by the trial court, our independent examination of the record confirms that a reasonable person, situated like defendant, would not have considered himself under arrest or otherwise restrained by police during the interview with Hoffman. While defendant clearly raised the spectre of incarceration, his concern was focused on the possibility of punishment resulting from involvement with Potts, not custody attendant to the interview. To the contrary, during the sessions with Hoffman, defendant acknowledged his freedom to leave the stationhouse and explained his decision to remain. Under such circumstances, we conclude defendant was not then in custody, as contemplated by <u>Miranda</u>.

Accordingly, the court correctly admitted the related statements into evidence, and we affirm the convictions.

<u>Affirmed.</u>

-