UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, Beales and Chafin
Argued by teleconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.      Record No. 1220-13-4          JUDGE WILLIAM G. PETTY
NOVEMBER 26, 2013
JOHN HENRY McCRAY


FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Charles S. Sharp, Judge

Susan Baumgartner, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on briefs), for appellant.

Ian Whittle, Assistant Public Defender (Office of the Public
Defender, on brief), for appellee.


Pursuant to Code § 19.2-398, the Commonwealth appeals the decision of the trial court to

grant John Henry McCray's motion to suppress statements he made to police officers. On

appeal, the Commonwealth argues that the trial court erred in ruling that McCray was subjected

to custodial interrogation, which required the police officers to advise McCray of his Miranda

rights prior to questioning him. We agree and reverse the trial court's suppression of McCray's

statements.[1]

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] McCray was also indicted on two misdemeanors, obtaining money or property by false
pretense and driving on a suspended or revoked operator's license. Pursuant to Code § 19.2-398,
the Court will review the Commonwealth's appeal of the pretrial suppression order only insofar
as it pertains to the felony indictments.

## I. BACKGROUND

Because the parties are fully conversant with the record in this case and this memorandum opinion carries no precedential value, we recite only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

"In an appeal by the Commonwealth of an order of the trial court suppressing evidence, the evidence must be viewed in the light most favorable to the defendant and findings of fact are entitled to a presumption of correctness unless they are plainly wrong or without evidence to support them." Commonwealth v. Peterson, 15 Va. App. 486, 487, 424 S.E.2d 722, 723 (1992).

On January 11, 2013, Deputy Siegel and his field training officer, Deputy Miller, were dispatched to a Wal-Mart on a reported larceny in progress. Both deputies were in uniform, in a marked police cruiser, and displaying their badges of authority. The deputies were informed by dispatch that the suspects were two black men in a red or maroon SUV with Washington, D.C. license plates.

When the deputies arrived at the Wal-Mart, they were informed by dispatch that the SUV was backing out of a parking space directly in front of them. Deputy Siegel noticed that a Wal-Mart loss prevention employee was pointing at the SUV. The SUV, and the two men inside it, matched the description that was given by dispatch.

Deputy Siegel activated the emergency lights, but not the siren, of his police cruiser, and the SUV stopped where it was, which was on an access road connecting the parking lot to the highway. Deputy Siegel's police cruiser was perpendicular to the SUV, and there was nothing in front of the SUV to block it in.

Deputy Siegel approached the SUV. Deputy Siegel talked with both McCray, who was driving the SUV, and a passenger, who was later identified as Brandon Watts. Deputy Siegel

obtained a license from McCray, which he retained throughout the investigation, and received identifying information from Watts. Deputy Siegel returned to the police cruiser.

After returning to the police cruiser, Deputy Siegel ran a computer check on McCray's license and discovered that it was suspended in Virginia. Deputy Siegel ran a computer check using the identifying information he received from Watts and could not locate anyone in Virginia, Washington, D.C., or Maryland with the name and birth date that Watts provided.

Deputy Siegel, accompanied by Deputy Miller, approached the SUV to investigate the discrepancy with Watts's identity. Deputy Miller did not speak; instead, he merely observed Deputy Siegel's actions. After initiating contact with Watts, Deputy Siegel told McCray to remain in his vehicle and that he was not free to leave. Deputy Siegel then turned his attention to Watts and asked him whether he had accidentally provided incorrect information. Watts initially denied that he provided incorrect information, but eventually provided accurate identifying information. Deputy Siegel then arrested Watts for providing false information. The arrest took place approximately fifteen to twenty minutes after the SUV was stopped.

At some point near the end of Deputy Siegel's discussion with Watts about his providing of false information, Deputy Howell and his field training officer, Sergeant Walker, arrived on the scene. Deputy Howell and Sergeant Walker arrived in the same police cruiser, and they did not activate its emergency lights. Deputy Howell and Sergeant Walker stood next to the SUV while Deputy Siegel was talking with Watts.[2]

Around the same time that Deputy Howell and Sergeant Walker arrived on the scene, two loss prevention employees from Wal-Mart also arrived on the scene. The employees told the officers the details of their report of larceny. The loss prevention employees reported that Watts stole an iPod charger and left the store. Watts and McCray then entered the store together and

---

[2] There is no evidence that Deputy Howell and Sergeant Walker talked with McCray while they were standing near the SUV.

returned the iPod charger for a gift card, which they used to purchase a carton of cigarettes and two DVDs.

Watts refuted the story of the loss prevention employees. Watts said that he purchased the wrong charger, so he re-entered the store with McCray to return it. Watts insisted he had a receipt for the charger, which was located in the SUV. McCray was ordered to step out of the SUV. The SUV was searched, but no receipt was found. However, the officers did notice two, identical, boxed, thirty-two inch LCD televisions in the back of the SUV.

After ordering McCray out of the SUV, Deputy Siegel performed a pat-down search of McCray for weapons so that McCray could keep his hands in his pockets because it was cold outside. McCray then stood near the rear of the SUV as Deputy Siegel asked him questions about the suspected larceny. McCray gave the same story as Watts. Deputy Siegel then asked McCray about the televisions that were found in the back of the SUV.

While Deputy Siegel was questioning McCray, the other officers were talking with the loss prevention employees. The televisions were identified as Wal-Mart merchandise. The loss prevention employees contacted a nearby Wal-Mart, and it confirmed that the televisions were missing from its inventory.

McCray initially told Deputy Siegel that the televisions were a gift from a friend and that he was planning on giving them to another friend. Deputy Siegel suggested the televisions were stolen. In response, McCray said that Watts entered the Wal-Mart alone and exited with the televisions. After further questioning from Deputy Siegel,[3] in which the same questions were asked four or five times, McCray admitted that he had known that Watts planned to steal the

---

[3] On brief, McCray alleges that "at least three officers [were] doing the questioning." This assertion is contrary to Deputy Siegel's testimony at the suppression hearing. See App. at 45-46, 62. While Deputy Siegel confirmed that two other officers stood beside him and listened, there is no evidence in the record that they actually asked McCray any questions.

televisions.  The officers subsequently arrested McCray.  McCray's admission and arrest came approximately thirty to forty minutes after he was first stopped.

At a suppression hearing, the trial court held that McCray was subjected to custodial interrogation without <u>Miranda</u> warnings; therefore, it suppressed the statements that McCray made while he was detained.  The Commonwealth appealed to this Court.

## II.  ANALYSIS

On appeal, the Commonwealth contends that McCray was not in custody for purposes of <u>Miranda</u> when Deputy Siegel questioned him, and, thus, <u>Miranda</u> warnings were not required.  We agree.

> Under <u>Miranda</u>, before a suspect in police custody may be questioned by law enforcement officers, the suspect must be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to have an attorney, either retained or appointed, present to assist him.

<u>Dixon v. Commonwealth</u>, 270 Va. 34, 39, 613 S.E.2d 398, 400 (2005).  <u>Miranda</u> warnings, however, are required only during a custodial interrogation.  <u>Id.</u>

> Whether a person is "in custody" for purposes of one's rights pursuant to <u>Miranda</u> is a mixed question of law and fact.  In our analysis, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them."  However, "we review de novo the trial court's application of defined legal standards, such as . . . 'custodial interrogation,' to the particular facts of a case."

<u>Id.</u> (citations omitted).

To determine whether a person is in custody for the purposes of <u>Miranda</u>, we look to the circumstances of each case.  <u>Harris v. Commonwealth</u>, 27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998).  "'The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'"  <u>Id.</u> (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)).  This custody determination "'depends on the objective

circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" Id. (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Therefore, if a "reasonable person in the suspect's position would have understood that he or she was under arrest," then Miranda warnings must be given before police questioning. Id.

In determining whether a suspect is in custody, we consider several circumstances:

> whether police were able to physically seize the suspect, whether the suspect was physically restrained, whether firearms were drawn, whether there was physical contact between police and the suspect, whether the suspect was confined in a police car, whether police told the suspect he or she was free to leave, whether police engaged in other incidents of formal arrest such as booking, whether friends or relatives of the suspect were present, and whether more than one officer was present. Of equal importance are the officers' demeanor during the encounter, the length of the questioning, and the nature of the questions asked, the location of the encounter, and whether the subject was uniquely susceptible to intimidation.

Hasan v. Commonwealth, 276 Va. 674, 679-80, 667 S.E.2d 568, 571 (2008) (citations omitted). But "this list is not exhaustive, and other circumstances might bear on the question whether police have curtailed a particular suspect's freedom to a 'degree associated with a formal arrest.'" Id. at 680, 667 S.E.2d at 571 (quoting Beheler, 463 U.S. at 1125).

Moreover, "a Terry stop of a person to investigate suspicion is not necessarily subject to the requirements of Miranda." Bosworth v. Commonwealth, 7 Va. App. 567, 572, 375 S.E.2d 756, 759 (1989). Investigative stops allow a police officer to

> ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. . . . The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion [in the Supreme Court of the United States's] opinions that Terry stops are subject to the dictates of Miranda.

Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984).

Here, the trial court held,

> I think all of those circumstances taken together indicate that the presence of that number of officers, the coercive nature of the encounter, coercive in the sense that his codefendant was arrested in his presence after about a half hour of questioning, and the degree to which he was restrained, both by having his license maintained and by being told he couldn't leave, I think all of those indicators suggest that a reasonable person under those circumstances would believe I am in police custody. So I find that he was in custody.

It is without dispute that McCray's freedom of movement was restrained. This restraint, however, took place pursuant to an investigative stop that was based on reasonable suspicion that McCray was involved in a larceny. The issue here is whether the investigative stop evolved into a formal arrest that required Miranda warnings. Thus, we consider all of the circumstances of McCray's detention as viewed from the perspective of a reasonable person in deciding "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Beheler, 463 U.S. at 1125.

We first note there is no evidence that anyone other than Deputy Siegel questioned McCray. Further, for the first fifteen to twenty minutes of the investigative stop, there were only two officers present, Deputy Siegel and Deputy Miller. The other officers arrived later in the stop, but did not take part in the questioning of McCray. In Hasan, a case which the appellee heavily relies upon, the defendant was confronted by six officers, and a K-9 unit, standing in formation around him with their guns drawn. 276 Va. at 680-81, 667 S.E.2d at 572. The Supreme Court held that a reasonable person in those circumstances would understand that he was in custody. Id. at 681, 667 S.E.2d at 572. Hasan is distinguishable from this case. Here, the officers did not draw their weapons. The officers did not stand in formation around McCray. Instead, only one officer questioned McCray. Thus, we hold that the number of officers present at the scene would not lead a reasonable person to believe that he was in custody.

Further, the encounter was not coercive. McCray was not physically restrained.[4] Deputy Siegel's order to McCray to remain in his vehicle and statement that McCray was not free to leave do not amount to physical restraint. In Cherry v. Commonwealth, 14 Va. App. 135, 141, 415 S.E.2d 242, 245 (1992), the defendant was told to step out of his vehicle by a police officer who was conducting a narcotics investigation. The defendant did so. We held that this did not amount to a formal arrest for the purposes of Miranda because "[the defendant] had not been placed under formal arrest or restrained in any significant way." Id. Here, McCray was told to remain in his vehicle, and then subsequently told to step out of his vehicle. McCray was not placed in handcuffs, and he was not placed in a police cruiser. Cf. Dixon, 270 Va. at 40-41, 613 S.E.2d at 401 (finding that defendant was in custody because he was handcuffed and placed in a locked police car). The only physical contact between the officers and McCray was a pat-down search to make sure that McCray did not have any weapons on him while they were talking. Thus, we hold that McCray was not physically restrained to the point that a reasonable person in his position would believe that he was in custody.[5]

Moreover, the length of McCray's detention was not unreasonable. The entire investigation took approximately thirty to forty minutes. The first twenty minutes of the stop

_____

[4] The trial court found it "very significant that [McCray's] license was taken and held." The retention of a suspect's license is not necessarily a factor that helps to determine whether McCray was in custody. Instead, the retention of a license is a factor to determine whether a person has been seized for the purposes of the Fourth Amendment. McCain v. Commonwealth, 261 Va. 483, 491, 545 S.E.2d 541, 546 (2001) ("[A] police request made in a public place for a person to produce some identification, by itself, generally does not constitute a Fourth Amendment seizure."). There is no argument that McCray was not seized. McCray was seized pursuant to an investigative stop. Thus, we do not find this circumstance relevant to our determination of custody.

[5] The trial court noted that Watts's arrest was a circumstance that it considered in holding that McCray's detention was coercive. However, Watts was arrested for providing false information to the officers. Watts was not arrested for the larceny. McCray was present when Watts gave the officers false information. McCray was present, albeit sitting in the car, when Watts was questioned about his identity. Thus, we do not find this circumstance relevant to our determination of custody.

were dedicated to the investigation of Watts. Thus, although McCray was detained for thirty to forty minutes, he was actually investigated, or questioned, for a maximum of twenty minutes. This is not an unreasonable period of time to investigate a suspected crime. See Miller v. Commonwealth, 16 Va. App. 977, 980-81, 434 S.E.2d 897, 900 (1993) (holding that a wait of almost an hour was reasonable during investigative detention); Burgess v. Commonwealth, 14 Va. App. 1018, 1022, 421 S.E.2d 664, 667 (1992) (holding that a forty-minute detention was reasonable). Indeed, "[i]f a police officer is so justified in stopping a suspect, 'the officer may detain the suspect to conduct a brief investigation.'" Lawson v. Commonwealth, 55 Va. App. 549, 555, 687 S.E.2d 94, 97 (2010) (quoting McGee v. Commonwealth, 25 Va. App. 193, 202, 487 S.E.2d 259, 263 (1997) (en banc)). Deputy Siegel was justified in stopping McCray. Deputy Siegel was further justified in detaining McCray for a reasonable period of time to conduct the brief investigation of the larceny. Therefore, we hold that the length of McCray's detention would not lead a reasonable person in his position to believe that he was in custody.

After reviewing all of the circumstances of this case, we hold that a reasonable person would not believe that he was in custody to the degree associated with a formal arrest.

III. CONCLUSION

For the foregoing reasons, we reverse the trial court's granting of McCray's motion to suppress his statements.

Reversed.