UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Russell and AtLee
Argued at Fredericksburg, Virginia

BRENT DAVID TAYLOR

MEMORANDUM OPINION[*] BY
v.       Record No. 1031-14-4       JUDGE RANDOLPH A. BEALES
SEPTEMBER 13, 2016

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Lon E. Farris, Judge

Megan Thomas (King, Campbell, Poretz & Thomas, PLLC, on
briefs), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Following a jury trial, Brent David Taylor (appellant) was convicted of rape in violation of

Code § 18.2-61 and of aggravated sexual battery in violation of Code § 18.2-67.3. Appellant argues

on appeal that the trial court erred in refusing to suppress his non-Mirandized statements to police

because they were not voluntary and were made during a custodial interrogation; erred in refusing

expert testimony on the issue of voluntariness; erred in denying appellant a rape-shield hearing

pursuant to Code § 18.2-67.7; and erred in finding that the evidence presented at trial was sufficient

for conviction.

I. BACKGROUND

We consider the evidence on appeal "in the light most favorable to the Commonwealth as

we must since it was the prevailing party" in the trial court. Beasley v. Commonwealth, 60

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Va. App. 381, 391, 728 S.E.2d 499, 504 (2012) (quoting Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004)).

On April 25, 2012, the then-eighteen-year-old appellant, Brent David Taylor, met the alleged victim, Jane Doe,[1] who was seventeen years old at the time. That evening, Jane allowed her friend Kristina, along with Kristina's friend David and David's friend (appellant), to come over to Jane's house. At some point, David drove Kristina back to her house, leaving Jane and appellant alone at Jane's home. The Commonwealth charged that, during this time, appellant raped and sexually assaulted Jane while she was unconscious.

*Police Interview of Appellant*

In the afternoon hours of April 26, 2012, Detective David Cho of the Prince William County Police Department called appellant and asked him to come to the police station to answer some questions. Appellant testified that he "agree[d] to go down to the station." When appellant told Cho that he could be at the station in thirty minutes "because [he] had someone coming to give [him] a ride," Cho told appellant that he would instead send someone to pick appellant up. Another detective (Detective Gary Van Dyke) drove to appellant's home where appellant was waiting "[i]n the front yard." Appellant "walk[ed] through his yard toward [Van Dyke's] car," and Van Dyke, who was dressed in a plainclothes "shirt and tie," did not arrest appellant or frisk him. An unidentified woman was also at the residence with appellant. She said to the officer, "He's only eighteen." Appellant got into the front seat of the detective's unmarked vehicle, and the two of them rode to the police station. According to Detective Van Dyke, appellant was "relaxed" and "joking." Appellant himself testified, "When I first got to the police station, before entering the station, I did feel like I was only going to be there for a few minutes just to

---

[1] We use "Jane Doe" in an attempt to protect the alleged victim's privacy.

answer a few questions." The woman who was at appellant's house followed them in a separate vehicle to the police station.

The detective drove to the public entrance of the police station and walked with appellant to the front entrance through "doors open to the public." The officer testified that the woman followed appellant and the officer into the police station, but that she sat down and "stayed in the main part of the waiting room in the front of the police station." The detective used a security badge to open a locked and alarmed door leading from the main waiting room into a secure corridor. The detective then escorted appellant through another door into a windowless interview room. The detective got appellant "a pen and paper . . . and allowed him to write" after appellant informed him that "he was having anxiety and that he felt better when he was able to write." At that point, Detective Michelle Nemerow, who had met appellant on a previous occasion, entered the interview room and had a "friendly back and forth" conversation with appellant while he was waiting. She was not exactly sure how long it took, but estimated no more than five to ten minutes. Nemerow also allowed appellant to "roll[] his chair between the doorway" while waiting for the interview to begin, which she testified was not typically allowed because of concerns for officer safety. However, she stated that the detectives "were trying to make any concessions possible because he said to [her] that [he had] anxiety in the closed spaces."

When Cho arrived to begin the interview, he closed the door "to make sure that this was private, that nobody else would hear [their] conversation." Nemerow was not present at this time. Appellant "was sitting close to the door and [Cho] was sitting across from him." Appellant provided Cho with his identification, and Cho returned it immediately after copying down the information.

Cho began speaking with appellant about the prior evening. Almost an hour into the recorded portion of the interview, when Cho told appellant that he did not think his story matched some of the other individuals' descriptions of the evening, appellant admitted that he and Jane had kissed and that he had touched her bare breasts, buttocks, and crotch area during their time alone at the house while David took Kristina home. Appellant told Cho that they were kissing each other. He still denied "hav[ing] sex" with Jane. Appellant told Cho that David picked him up around 2:00 a.m. and that David came upstairs and saw Jane passed out and helped put her into her bed. Appellant acknowledged that David saw Jane with her pants partially down at that point.

After this statement, Cho told appellant, "Okay. Okay. I'll be right back, I need to make this phone call, okay?" Then, Cho left the interview room for almost twenty minutes. Toward the end of the twenty-minute interval, Officer Scott Lawhead entered the interview room with a search warrant to take DNA evidence from appellant. Lawhead swabbed appellant's penis and the inside of appellant's mouth. Appellant removed his pants for the penis swab, he was cooperative with the swabbing, and he even asked Lawhead at one point, "No blood, no nothing?" Lawhead responded, "No, not at this point, I don't think." Appellant also stated to Lawhead, "I don't know why they didn't come and ask me (inaudible), why get a search warrant when they could have just asked?" Officer Lawhead left the room without answering.

When Cho returned to the interview room he immediately asked appellant, "Hey, Brent, uh, we think that you've been telling us that, uh, you didn't have sex right? Is that my understanding? That you guys did not have intercourse?"— As Cho continued to ask questions, appellant asked, "Can I go home now?" Cho replied, "Just, uh, got some more questions. Uh, do you know Detective Nemerow?" To which appellant responded, "No." Cho explained that Nemerow would be joining them because they "just want to talk to you [appellant] about a few

other things, okay?" Appellant responded, "But why? You've got all the information, you got—" Cho interrupted and said, "I don't, I don't, that's why. There's other things that I need from you . . . I need to get some clarification." Appellant interrupted and said, "I can't be in here this [sic] longer, I can't be in here." Cho insisted, "I need to get some clarification, okay. Um, is there anything else that I need to know than what you told me? Anything else that, you know, you want me, you want me to know about what happened?" Appellant then said, "I wanna go home. I wanna go home, smoke my cigarette and just try to slow my heart rate because right now, I can't fucking keep my (inaudible)." Cho said, "All right, man, then I'm gonna just ask you a few more questions, okay? How's that?" Appellant responded, "Sure."[2]

When appellant continued to get upset over the search warrant, Cho repeatedly told appellant that the search warrant was "procedure" and "what we do" in every case. At no point during this interaction did appellant stand or make a motion to leave. Cho continued to question appellant, and appellant again denied having sexual intercourse with Jane.

About an hour and a half into the interview, Nemerow then re-entered the interview room. She spoke at length with appellant about her connection to him as the wife of his former teacher – and how she knew appellant's mother. She also asked appellant to "tell the truth." Eventually, appellant admitted, "I screwed up. . . . It's pretty bad."

Appellant said, "We were talking and messing around but then she passed out. And I still messed around with her. I felt her up while she was still asleep. I was really drunk. I did take off her pants." Appellant said that he was not sure whether he penetrated her vagina with his penis, but if he did, he did it twice ("I literally, probably only got it in if I did, twice."). At the

---

[2] There are slight variations between the transcripts of appellant's interview and the interview itself. Any time this opinion quotes the interview the language is taken directly from the recording, which was admitted at trial as evidence.

conclusion of the interview, appellant wrote an apology note to Jane, which was admitted into evidence.

At the conclusion of the interview, around 5:30 p.m., Cho walked appellant back into the waiting room, and appellant "almost immediately" left the police precinct. At no time before, during, or immediately after the interview was appellant frisked, handcuffed, or told that he was being placed under arrest. However, an arrest warrant was issued for appellant at 9:08 p.m. that same evening, and officers arrested appellant at his home around 10:30 p.m.

*Evidence at Trial*

At trial, the Commonwealth put on evidence that Jane and her friend Kristina went to appellant's house to "hang out" with appellant and his friend David. The four ultimately decided to go to Jane's house, and they drove there in two separate cars. Jane's father and stepmother were out of town, and Jane had the house to herself. Despite all being underage, the four drank alcohol while at the house. Kristina went into the garage with David for stretches of time. Appellant and Jane spent time in both the basement and Jane's bedroom, where they sat looking at books. When Kristina needed to go home, she went back into the basement where she found Jane "completely incoherent" and "slumped over" on the couch. Kristina attempted to help Jane stand up, but Jane stumbled and knocked over a glass of clear liquid onto the table. Appellant cleaned up the spill, and he carried Jane upstairs to her bedroom and laid her on the floor. Kristina followed with Jane's phone and laid it on the floor beside Jane.

Appellant told Kristina to go home because he would take care of Jane. David agreed to drive Kristina home. David dropped off Kristina at her home and returned to Jane's house. According to Kristina, some time after David dropped her off, he texted her, "They're fucking." Kristina responded, "LOL. Really? Oh, God. She's a virgin." David said, "No way. This is

crazy." Kristina replied, "What is? Do you miss me?" David said, "Yes, I miss you, and they're fucking."

David and *appellant* also exchanged a number of text messages on the evening of April 25, 2012 into the early morning hours of April 26, 2012, which were entered into evidence at trial. Appellant sent David a text message that read, "Dude this blows," to which David replied, "I know bro make her drink[.] I'll try to drive k home while u 'wait' here with [Jane.]" Appellant responded, "I'm trying dude ain't working," and David answered, "It will once I drive k home and ur alone with [Jane] just keep feedin her liquor." Again appellant responded, "I'm trying. Ugh wtfffffff," and David told appellant, "Hit her up."

The next morning, Jane awoke in her bed without pants or underwear on. She was confused and struggled to recall what had happened. She threw her clothes into the washing machine and took a shower. As she showered, she felt "stinging" in her vagina, and she began to remember fragments of the prior evening. She testified, "I remember laying on the side of the couch and going to sleep" and later vomiting on the floor in front of the couch. The next thing she recalled was "Brent carrying [her] upstairs." She did not recall her clothes coming off, but she did testify that she remembered feeling "his penis" in her vagina and telling appellant "'no' multiple times." Jane recounted feeling "[s]tretching" and pain. She remembered that appellant told her to "shh." Jane testified that she did not remember him touching any other parts of her body.

When Jane went to school the next morning, she told her school counselor and teacher that she had been sexually assaulted the previous night although she claimed that an unknown perpetrator had entered her house through the garage door. After speaking with the police, Jane went to the hospital for a SANE exam. The medical professional, who examined Jane, testified

at trial that the exam revealed a laceration and bruising on her hymen consistent with nonconsensual sexual intercourse.

## II. ANALYSIS

### A. Police Interrogation

Appellant argues that the trial court erred in denying appellant's motion to suppress his statements to police because appellant was subject to custodial interrogation during the entire police station interview and was thus entitled to Miranda warnings. See generally Miranda v. Arizona, 384 U.S. 436 (1966). In addition, appellant argues that his statements should have been suppressed because they were made involuntarily.

#### 1. *Standards of Review*

"[O]n appeal of a denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth, the party prevailing below." Aldridge v. Commonwealth, 44 Va. App. 618, 638, 606 S.E.2d 539, 549 (2004). "Further, 'in reviewing a trial court's denial of a motion to suppress, "the burden is upon [the appellant] to show that the ruling . . . constituted reversible error."'" Id. (alterations and omissions in original). On appeal, this Court reviews "questions of law de novo, including those situations where there is a mixed question of law and fact." Perry v. Commonwealth, 280 Va. 572, 578, 701 S.E.2d 431, 435 (2010) (quoting Westgate at Williamsburg Condo. Ass'n v. Philip Richardson Co., 270 Va. 566, 574, 621 S.E.2d 114, 118 (2005)).

#### 2. *Custodial Interrogation*

When a suspect is subject to "custodial interrogation" by the police, that suspect is entitled to Miranda warnings. "Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Commonwealth v. Milner, 13 Va. App. 556, 558,

413 S.E.2d 352, 353 (1992) (quoting Miranda, 384 U.S. at 444). "The ultimate inquiry [into whether an individual is subject to custodial interrogation] is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Harris v. Commonwealth, 27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Factors to be considered when determining whether the totality of the circumstances point to the conclusion that a suspect is in custody are: (1) the manner in which the individual is summoned by the police; (2) the familiarity or neutrality of the surroundings; (3) the number of officers present; (4) the degree of physical restraint; (5) the duration and character of the interrogation, and (6) the extent to which the officer's beliefs concerning the potential culpability of the individual being questioned were manifested to the individual. See id.

> Because the determination whether a suspect is "in custody" requires an objective focus, the only relevant inquiry is how a reasonable person in the suspect's situation would have understood his circumstances. Thus, the subjective perspective of either the suspect or the interrogating police officer has no bearing on the issue whether the suspect was "in custody" at the time he was questioned by the police.

Dixon v. Commonwealth, 270 Va. 34, 40, 613 S.E.2d 398, 401 (2005) (internal citations omitted).

Appellant was ultimately subject to custodial interrogation when Officer Lawhead served appellant with a search warrant, Detective Cho confronted appellant as the primary suspect, and Cho kept questioning appellant and did not tell him that he was free to leave after appellant asked to go home. At the outset, we know that the degree of coercive danger Miranda wished to guard against "does not exist 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect' as the perpetrator of the crime." Tizon v. Commonwealth, 60 Va. App. 1, 18, 723 S.E.2d 260, 268 (2012) (quoting Howes v.

Fields, 132 S. Ct. 1181, 1188 (2012)). Here, although the police provided appellant with transportation to the station, he had already agreed to come to the station. That the police provided transportation as opposed to waiting for appellant's ride to pick him up did not alter the voluntary nature of appellant's interaction at that point in time. Furthermore, appellant's female friend followed in a separate car and appeared to be waiting in the police lobby.

Appellant walked into the police station with a detective, who led him behind a door which required badge access, where he was placed in a small room that had no windows. However, the trial court found that the door leading from the lobby to the corridor and the door to the interview room were both unlocked. Thus, the evidence established that the doors could open from the inside without a badge even if the alarm would still go off.

Appellant was in a windowless room down a secure corridor, but the officers engaged in easygoing conversation with him and only Cho stayed in the room to interview appellant. Cho told appellant that he was shutting the door to the interview room for their own privacy. Throughout the first fifty minutes of the interview, appellant and Cho discussed appellant's whereabouts on April 25 up to the time of the interview on April 26 – as well as appellant's relationship with Kristina and Jane. Thus, the totality of the circumstances lead us to conclude that a reasonable person in appellant's position would not feel that he was being kept in the interview room against his will at this point. Accordingly, he was not subject to custodial interrogation during this portion of his encounter with Cho.

However, neither the encounter nor the analysis ends at that point in time. As Cho continued to question appellant, Cho began to focus his questions on the possible romantic interaction between Jane and appellant. Appellant admitted that they had been kissing and touching and that Jane "passed out" in front of him with her pants part of the way down and that David returned and saw Jane with her pants partially removed. Cho then immediately told

appellant that he had to make a phone call and left appellant in the interrogation room. After being left alone for some time, another officer whom appellant had not yet met entered the room unannounced. That officer, Officer Lawhead, served appellant with a search warrant. Lawhead told appellant that he would be swabbing appellant for DNA in his mouth and on his penis. At this point, appellant was certainly not free to leave, at least until the swabbing required by the search warrant had been completed. He was alone in a room with the door shut in the back of a secure corridor of a police station waiting for Cho to return, and then an unknown officer showed up with a search warrant with which appellant was legally obligated to comply.

"Not all restraints on freedom of movement amount to custody for purposes of Miranda. We have 'decline[d] to accord talismanic power' to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Fields, 132 S. Ct. at 1189 (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). The scenario in this case is different, however, because the location in which the search warrant was served, the manner in which it was executed, what it sought to obtain, and the limited discussion explaining the necessity of the search warrant after it was executed would cause a reasonable person to conclude that appellant was not free to leave the police interview room. However, at this time, appellant was not being questioned by the police.

Several minutes later, Cho re-entered the room. Cho's first words to appellant signaled that the inquiry had now focused on appellant and that Cho believed that appellant had committed a criminal act: "Hey, Brent, uh, we think that you been telling us that, uh, you didn't have sex right? Is that my understanding? That you guys did not have intercourse?" While "[t]he fact that the investigation had become accusatory and focused upon a suspect is not

necessarily determinative of custody[,]" <u>Wass v. Commonwealth</u>, 5 Va. App. 27, 33, 359 S.E.2d 836, 839 (1987), it is a factor to be considered in the totality of the circumstances.

Cho continued to ask appellant about the DNA evidence and about being with Jane. At that point, appellant asked, "Can I go home?" Cho, instead of answering appellant's question, continued with his interrogation and told appellant, "Just, uh, got some more questions." Thus, not only did Cho fail to answer appellant's direct question but he also signaled that he would continue questioning appellant despite appellant's request to go home. The clear implication was that appellant *could not leave*. In this context, Cho's deliberate avoidance of answering appellant's question, coupled with the previously executed search warrant, would signal to a reasonable person sitting in appellant's position that he was not free to leave. Furthermore, while courts have said that failing to alert a suspect that he is free to leave is not always dispositive, <u>see</u> <u>Davis v. Allsbrooks</u>, 778 F.2d 168, 171-72 (4th Cir. 1985) (cited with approval in <u>Wass</u>, 5 Va. App. at 33, 359 S.E.2d at 840), the Court in <u>Davis</u> emphasized that *the totality of the circumstances otherwise* pointed to freedom of movement. By this point in the interview, appellant had effectively been forced to stay in the interrogation room while he was swabbed for DNA, had been accused of lying to police, and, for all intents and purposes, had not been allowed to leave. This series of events transformed the encounter.[3]

The totality of the circumstances leads to the conclusion that appellant was in custody – and subject to custodial interrogation – once Cho resumed his questioning. The service of the search warrant and swabbing of appellant's mouth and penis, Cho's questions to appellant as soon as he reentered the room after the swabbing, and Cho's refusal to answer appellant's

---

[3] We are not articulating a *per se* rule that service of a search warrant during police questioning always transforms an encounter into a custodial interrogation because of the restraint on movement that comes with a search warrant. There *are* scenarios in which the service of a search warrant during an interrogation will not change the nature of the questioning.

- 12 -

request to leave combine to tip the scales from routine police questioning to custodial interrogation. Because appellant was subject to custodial interrogation and had not been given a Miranda warning, we hold that any of appellant's statements that were made after Cho resumed questioning should have been suppressed, including appellant's "apology note."

### 3. *Voluntariness of Appellant's Statement*

Appellant also asserts on appeal that the trial court erred in denying appellant's motion to suppress his statement to police because it "was involuntary due to his anxiety disorder." We, therefore, now examine whether appellant's testimony was voluntary during the police questioning *before* appellant was subject to custodial interrogation.[4] "Whether a statement is voluntary is ultimately a legal rather than a factual question, but subsidiary factual decisions are entitled to a presumption of correctness." Robinson v. Commonwealth, 63 Va. App. 302, 310, 756 S.E.2d 924, 927 (2014). "Thus, '[this Court is] bound by the trial court's subsidiary factual findings unless those findings are plainly wrong.'" Id. at 310, 756 S.E.2d at 927-28 (alterations in original).

"The test to be applied in determining voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" Midkiff v. Commonwealth, 250 Va. 262, 268, 462 S.E.2d 112, 116 (1995) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). "Evidence of coercive police activity is a *necessary*

---

[4] We need not look beyond the point at which appellant was subject to custodial interrogation to determine whether those statements were made voluntarily because we have already determined that the unMirandized statements made after custodial interrogation must be suppressed, and we resolve the case on the narrowest and best grounds available. See Commonwealth v. Swann, 290 Va. 194, 196, 776 S.E.2d 265, 267 (2015) ("The doctrine of judicial restraint dictates that we decide cases '"on the best and narrowest grounds available."'" (quoting McGhee v. Commonwealth, 280 Va. 620, 626 n.4, 701 S.E.2d 58, 61 n.4 (2010))). However, because appellant also argues that his statements to Cho prior to the encounter evolving into a custodial interrogation were not voluntary, we address this issue.

*predicate* to the finding that a confession is not voluntary." Washington v. Commonwealth, 43 Va. App. 291, 303, 597 S.E.2d 256, 262 (2004) (emphasis added) (internal quotation marks omitted); see also Colorado v. Connelly, 479 U.S. 157, 167 (1986). However, coercive police activity is not necessarily sufficient for a finding that a confession is involuntary. United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (*en banc*); see also Hill v. Commonwealth, 52 Va. App. 313, 318-20, 663 S.E.2d 133, 135-36 (2008). This is because "voluntariness is not equated with the absence of intimidation." Robinson, 63 Va. App. at 312, 756 S.E.2d at 928 (alteration and internal quotation marks omitted). "[A] court determining whether a confession was voluntary must consider both 'the details of the interrogation' and 'the characteristics of the accused.'" Rodriguez v. Commonwealth, 40 Va. App. 144, 157, 578 S.E.2d 78, 84 (2003) (internal quotation marks omitted). "Such factors include 'the purpose and flagrancy of any police misconduct,' 'the length of the interview,' and any 'moral and psychological pressures to confess emanating from official sources.'" Id. (internal quotation marks omitted).

Here, the evidence supports the trial court's decision that appellant's statements were not coerced. Appellant's exchanges with the officers before the interview started were "relaxed" and "joking." When appellant stated that he felt uncomfortable in closed spaces, Nemerow left the door open and provided appellant with a pen and paper so that he could write to relieve his anxiety. Appellant's demeanor during the beginning of the interview was calm and conversational. Appellant was with only Cho for most of the interview and was questioned for approximately one hour before Cho left for a period of twenty minutes. Appellant argued that Cho raised his voice at appellant, which contributed to the involuntariness of appellant's confession. It is true that approximately fifty-one minutes into the interview, Cho changed his tone of voice, and appellant asked him, "Can you please lower your voice?" However, the trial

- 14 -

court, examining the first portion of the interview including this part (before Detective Cho left to make his phone call), specifically found, "That's not a prolonged interview. It's an hour and five minutes. It's not threatening." The interview bears no markings of a coerced confession. Cho did not engage in misconduct, the interview was not particularly long, and Cho did not exert "any moral and psychological pressures" on appellant. Id. Therefore, we hold that – with respect to the interview before appellant was subject to custodial interrogation – the trial court did not err in concluding that appellant's statement was voluntary.

### 4. *Harmless Error*

The Commonwealth argued on appeal that, even if this Court finds that appellant's statements to police were obtained while appellant was in custody without Miranda warnings in violation of his Fifth Amendment rights, such error was harmless and the convictions against appellant should be affirmed. Appellant argues that appellant's statements to police were not harmless error.

> When a federal constitutional error is involved, a reversal is required unless the reviewing court determines that the error is harmless beyond a reasonable doubt. The reviewing court must determine "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" In making that determination, the court must consider, among other factors, "[1] the importance of the tainted evidence in the prosecution's case, [2] whether that evidence was cumulative, [3] the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and [4] the overall strength of the prosecution's case."

Pitt v. Commonwealth, 260 Va. 692, 695, 539 S.E.2d 77, 78 (2000) (numbering added) (first quoting Chapman v. California, 386 U.S. 18, 23 (1967) (internal citations omitted), and then quoting Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) (internal citation omitted)).

- 15 -

In Zektaw v. Commonwealth, 278 Va. 127, 677 S.E.2d 49 (2009), Zektaw was charged with rape, attempted sodomy, abduction, and assault and battery. Id. at 131, 677 S.E.2d at 51. Zektaw made a motion to the trial court to suppress evidence of his confession that was obtained after invoking his right to ask for counsel. Id. The trial court denied Zektaw's motion. At trial, Zektaw's girlfriend (the victim) testified, a SANE nurse testified that the injuries on the victim were consistent with nonconsensual sexual intercourse, the victim's friend and cousin both testified on her behalf to corroborate the victim's version of events, and the Commonwealth admitted evidence of a voicemail that Zektaw left for the victim on her phone and a transcript of a phone conversation between Zektaw and the victim in which Zektaw "partially corroborated [the victim's] testimony." The Supreme Court ultimately determined:

> We cannot conclude beyond a reasonable doubt that there is no reasonable possibility that Zektaw's statements did not contribute to his convictions or to the severity of the jury's recommended punishment. Zektaw's statements were *inculpatory* on the assault and battery conviction and *made the Commonwealth's case much stronger* for the rape and abduction charges.

Id. at 140, 677 S.E.2d at 56 (emphasis added).

Furthermore,

> [a] confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (quoting Bruton v. United States, 391 U.S. 123, 139-40 (White, J., dissenting)).[5]

---

[5] While the test for determining whether constitutional error is harmless is indeed stringent, it is possible that an erroneously admitted confession could be harmless error. Thus,

In this case, while there is significant evidence supporting appellant's convictions (without considering appellant's statements that should be suppressed), the portions of appellant's statements made after he was in custody make the Commonwealth's case much stronger for the rape and aggravated sexual battery charges. During the time the rape and aggravated sexual battery were alleged to have happened, Jane and appellant were alone in the house together. As a result, appellant and Jane are the only two people who have first-hand knowledge of the events surrounding the alleged rape and aggravated sexual battery. Jane testified based on her recollection of events after a night of excessive drinking, and acknowledged that she was not conscious during the entire event. Thus, any statements appellant made about his actions that evening that corroborate Jane's account would greatly strengthen the Commonwealth's case. Appellant initially insisted that he did not have sexual intercourse with Jane – and only admitted that he may have put his penis in her vagina *after* he was subject to custodial interrogation.

With regard to evidence to support the aggravated sexual battery charge, before appellant was subject to custodial interrogation he said that he and Jane were kissing each other and touching each other ("my hands were going everywhere"). He said that "she didn't mind" him touching her bottom and that he touched her breasts once or twice; he also said that he reached to touch her vagina but that she "slammed [his] hand away." However, it was only *after* he was subject to custodial interrogation that he admitted, "[s]he passed out and I still messed around with her. I felt her up while she was still asleep." As charged in the indictment, one element of aggravated sexual battery is that "[t]he act is accomplished through the use of the complaining witness's mental incapacity or physical helplessness." Code § 18.2-67.3(A)(2). Physical

---

our ruling should not be interpreted as a rule that all erroneous admissions of confessions constitute reversible error.

- 17 -

helplessness "means unconsciousness or any other condition existing at the time of an offense under this article which otherwise rendered the complaining witness physically unable to communicate an unwillingness to act and about which the accused knew or should have known." Code § 18.2-67.10(4). Sleep can constitute physical helplessness. See Woodward v. Commonwealth, 12 Va. App. 118, 121, 402 S.E.2d 244, 245-46 (1991). Thus, only *after* he was subject to custodial interrogation did appellant clearly admit to touching Jane while she was physically helpless (an element of the aggravated sexual battery charge). Furthermore, appellant's custodial statements about touching Jane after she was unconscious provide the only direct evidence that he intended to touch her while she was unconscious. See Quinn v. Commonwealth, 25 Va. App. 702, 720, 492 S.E.2d 470, 479 (1997) ("Based on our review of the record, we hold that the erroneous admission of appellant's statements was not harmless. Appellant's statements . . . also provided the only direct evidence in the record of appellant's *knowledge* that the tools and equipment loaded onto the truck by his son belonged to 'another' and of his *intent* to 'permanently deprive' Messrs. Worley and Truslow of possession of these items.").

In addition, the trial court admitted appellant's apology note to Jane into evidence at trial. The apology note was written while he was in custody. In the note, appellant asks for forgiveness and acknowledges, "I screwed up so bad and I'm so sorry." The Commonwealth also relied extensively on appellant's confession during its closing argument ("[N]o stranger came into the garage and did this. Brent Taylor did this. He told you that he did it."). In this case, we cannot conclude *beyond a reasonable doubt* that appellant's statements – verbal and written – that were made after he was subject to custodial interrogation and the Commonwealth's reliance on his statements for their closing argument "did not contribute to his convictions or to the severity of the jury's recommended punishment." Zektaw, 278 Va. at 140, 677 S.E.2d at 56.

Therefore, because the error of the trial court here was not harmless beyond a reasonable doubt, we must reverse appellant's convictions. [6]

## B. Expert Witness Testimony[7]

Appellant also argues that the trial court erred when it sustained the Commonwealth's objection to appellant's expert witness testifying at the motion to suppress, because "the witness's testimony would have been relevant to the issue of voluntariness." The Commonwealth asserts that appellant failed to preserve this issue for appeal. We agree. "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1988); Rule 5A:18. After the Commonwealth objected at the hearing, appellant's counsel said,

> Judge, with respect to this hearing, the false confession issue is probably *not* what we're planning to go into today. What we are calling him for today is he is a clinical and forensic psychologist and we wanted to go into the anxiety disorder, his review of the medical records, his personal interview with Mr. Taylor and so forth to give an opinion whether or not he is in the class of persons that would feel –

(Emphasis added). The court interrupted. After some back and forth between the trial court and appellant's counsel, trial counsel said, "I think in terms of whether or not he was suffering from an anxiety attack will be very relevant to the Court's consideration of whether or not he would

---

[6] This is not to say that, absent appellant's confession, the evidence was insufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that appellant was guilty of the charged offenses. The testimony of the victim and other evidence would have been sufficient to support such convictions. However, "[h]armless error analysis is not simply a sufficiency of the evidence analysis." White v. Commonwealth, 66 Va. App. 333, 365, 785 S.E.2d 239, 255 (2016) (internal quotation marks and citations omitted). We only hold that we cannot conclude to the requisite level of certainty (i.e., beyond a reasonable doubt) that the erroneously admitted statements did not influence the jury, as factfinder, in reaching its conclusions.

[7] Once again, because appellant's argument that *none* of his statements were voluntary applies to the statements he made before the encounter with Cho became a custodial interrogation, we address this assignment of error.

have *felt able to leave in this situation.* And *that's the purpose* for him to testify today."

(Emphasis added). Whether an individual feels able to leave is part of the custody analysis – not

part of a voluntariness analysis. Most tellingly, appellant's counsel never even used the word

"voluntary" or "voluntariness" in his argument to the trial court. Appellant argues that the

Commonwealth raised the issue of voluntariness such that it is preserved for appeal. In the

Commonwealth's final statements to the trial court, the Commonwealth said, "Well, I think that

that is the fact that you are called upon to determine and he's asking to put in expert opinion

testimony as to the voluntariness of this statement given this person's disorder." The trial court

then found:

> Absent notice that you are claiming the Defendant was not sane at
> the time of the offense or the interview or was not competent to
> make a statement at the time o[f] the interview, the doctor's
> opinion is simply not relevant. And again, this is an objective
> standard, not a subjective standard. So I sustain the objection.

The trial court, by reminding appellant that the court was applying an objective standard,

was clearly under the impression that he was ruling on the relevance of testimony about

appellant's anxiety as it related to *custodial interrogation*. "The laudatory purpose behind Rule

5A:18 . . . is to require that objections be promptly brought to the attention of the trial court with

sufficient specificity that the alleged error can be dealt with and timely addressed and corrected

when necessary." Brooks v. Commonwealth, 61 Va. App. 576, 581, 739 S.E.2d 224, 226-27

(2013) (*en banc*) (omission in original) (citation omitted). Therefore, appellant failed to clearly

and specifically raise the issue of expert testimony on voluntariness before the trial court and

certainly failed to obtain a ruling on it. "Under [Rule 5A:18], a specific argument must be made

to the trial court at the appropriate time, or the allegation of error will not be considered on

appeal. A general argument or an abstract reference to the law is not sufficient to preserve an

- 20 -

issue." Edwards v. Commonwealth, 41 Va. App. 752, 760, 589 S.E.2d 444, 448 (2003) (*en banc*) (internal citations omitted).

On brief, appellant argues that this Court should nevertheless consider whether the expert witness should have been allowed to testify at the suppression hearing on the issue of voluntariness under the ends of justice exception because "relevant evidence as to Appellant's state of mind during his interrogation *is permitted*." (Emphasis added). Appellant does not proffer any affirmative proof that denying expert testimony on this issue in this case caused a miscarriage of justice. "Application of the ends of justice exception requires proof of an error that was 'clear, substantial and material.' The record 'must affirmatively show that a miscarriage of justice *has* occurred, not that a miscarriage *might* have occurred.'" West v. Commonwealth, 43 Va. App. 327, 338, 597 S.E.2d 274, 279 (2004) (first quoting Brown v. Commonwealth, 8 Va. App. 126, 132, 380 S.E.2d 8, 11 (1989), and then quoting Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997)). As a result, we will not consider this assignment of error on appeal.

## C. Rape-Shield Hearing[8]

Next, appellant argues that the trial court erred in denying his request for a rape shield hearing pursuant to Code § 18.2-67.7. On appeal, we review the trial court's denial of appellant's motion for a rape shield hearing for an abuse of discretion. See Ortiz v. Commonwealth, 276 Va. 705, 712, 667 S.E.2d 751, 756 (2008) (reviewing the trial court's denial of appellant's pre-trial motion for abuse of discretion). Before trial, appellant sought a rape shield hearing in order to cross-examine Jane as to "any prior sex acts that might account

---

[8] Although our decisions regarding custodial interrogation and harmless error necessitate reversal of the convictions, we address the assignment of error regarding the rape-shield hearing because of the likelihood that the issue will arise again on remand. See Smith v. McLaughlin, 289 Va. 241, 259, 769 S.E.2d 7, 17 (2015).

for the injuries documented in the SANE report and the presence of two Y chromosomes in her underwear." At the hearing, the trial court ruled, "I think this is nothing more than a fishing expedition and I think it lines up specifically with the case cited by Ms. Ashworth [the prosecutor] both in her reply brief and today and I deny your request."

This Court has held previously that "[t]he plain and unambiguous language of Code § 18.2-67.7 does not require a trial court to hold an evidentiary hearing on every request." Blackmon v. Commonwealth, 33 Va. App. 728, 734, 536 S.E.2d 918, 921 (2000). Instead, the statute requires a trial court to hold a hearing before a trial court can admit at trial "evidence of specific instances of prior unchaste character or sexual conduct." Id. In Blackmon, Blackmon "failed to proffer any testimony or evidence which he intended to elicit from [the victim] concerning prior sexual conduct. Instead, he merely requested that the trial court allow him to question [the victim], under oath, in order to discover potential exculpatory evidence pertaining to the source of the semen on [the victim's] thigh." Id.

Similarly in this case, appellant argued to the trial court that Jane *might* have engaged in sexual activity with another person and lied about appellant's involvement. Appellant proffered the fact that a nurse would testify that Jane suffered physical injury to her vagina and that a forensic examination of Jane's underwear revealed the presence of two Y chromosomes on that pair of underwear. At the hearing, appellant did not allege that Jane had engaged in any *specific* conduct, but said that the fact that two Y chromosomes (male chromosomes) were present *could* support the theory of another boy or boys "having oral sex" with Jane. Appellant ultimately argued "that [Jane's] sexual history should be able to be explored or disclosed to us so that we can prepare this case adequately."

The purpose of a rape-shield hearing is found in the language of the statute:

> Evidence described in subsections A and B of this section shall not be admitted and may not be referred to at any preliminary hearing or trial until the court first determines the admissibility of that evidence at an evidentiary hearing to be held before the evidence is introduced at such preliminary hearing or trial.

Code § 18.2-67.7. Thus, it was incumbent on appellant to *proffer evidence* of *specific instances of conduct* that fit into category A of Code § 18.2-67.7.[9]

However, the pair of underwear that the lab analyzed was not the pair Jane wore on the night of the alleged criminal activity. Instead, the underwear tested was the pair she put on the next day after she showered. Appellant conceded that sperm, spermatozoa, and seminal fluid were *not* found in the underwear and that it was not clear how the DNA that showed the two Y chromosomes was deposited in the underwear. However, appellant also conceded that such DNA evidence could be transferred easily. Therefore, this evidence – without further explanation from appellant – does not make it more likely that Jane was then engaged in conduct of a sexual nature with a different male than appellant – much less that Jane was previously engaged in a specific instance of sexual conduct with an individual other than appellant.

---

[9] Code § 18.2-67.7(B) is not relevant based on appellant's arguments. Code § 18.2-67.7(A), the part of the statute on which appellant relies, states in relevant part:

> In prosecutions under this article, . . . general reputation or opinion evidence of the complaining witness's unchaste character or prior sexual conduct shall not be admitted. . . . [E]vidence of specific instances of his or her prior sexual conduct shall be admitted only if it is relevant and is:
>
> 1. Evidence offered to provide an alternative explanation for physical evidence of the offense charged which is introduced by the prosecution, limited to evidence designed to explain the presence of . . . physical injury to the complaining witness's intimate parts; or
>     . . . .
> 3. Evidence offered to rebut evidence of the complaining witness's prior sexual conduct introduced by the prosecution.

As this Court has opined, "It logically follows that a trial court can make a threshold evaluation of a motion to hold a hearing to determine the 'admissibility' of the evidence at issue based upon its relevant and probative value *only after* 'specific instances' of sexual conduct occurring prior to the charged offense have been alleged and proffered." Blackmon, 33 Va. App. at 734, 536 S.E.2d at 921. In conclusion, we find that the trial court did not abuse its discretion in denying appellant's request for a rape shield hearing because appellant did not actually allege or proffer any evidence of specific instances of Jane's prior sexual conduct.

### D. Sufficiency of the Evidence

Appellant argues that the Commonwealth failed to present sufficient evidence to support the jury's verdicts convicting him of rape and aggravated sexual battery – specifically that the Commonwealth could not prove that Jane was mentally incapacitated or physically helpless. In addition, because we reverse and remand this case for a new trial, "a full sufficiency analysis is required to satisfy the mandate of the Double Jeopardy Clause of the federal Constitution." Parsons v. Commonwealth, 32 Va. App. 576, 581, 529 S.E.2d 810, 812 (2000). "If the evidence adduced at trial was insufficient to convict [appellant], he is entitled to an acquittal; if he is so entitled, a remand for retrial would violate the Constitution's prohibition against double jeopardy." Id.

#### 1. *Standard of Review*

When considering the sufficiency of the evidence presented below, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner, 268 Va. at 330, 601 S.E.2d at 574, "[w]e must instead ask whether '*any*

- 24 -

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663, 588 S.E.2d at 387 (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). See also Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

## 2. *Evidence at Trial*

Appellant admitted that he penetrated Jane's vagina with his penis when Jane was unresponsive, and he admitted that he also touched Jane's breasts, buttocks, and vagina while she was "asleep."[10] When a confession is relied on at trial, only "'slight corroboration of the confession is required to establish corpus delicti beyond a reasonable doubt.' However, such slight corroboration need not be 'of all the contents of the confession, or even all the elements of the crime.'" Allen v. Allen, 287 Va. 68, 74, 752 S.E.2d 856, 860 (2014) (first quoting Cherrix v. Commonwealth, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999) (emphasis in original), and then quoting Watkins v. Commonwealth, 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989)). Appellant repeatedly explained to Cho that Jane drank a substantial amount of alcohol that evening and that when they were alone together Jane was not always conscious. In fact, appellant repeatedly referenced the fact that she "passed out" and that she was "pretty drunk." Text messages

---

[10] We consider all of the evidence at this stage, even if we ultimately conclude that appellant's confession should be suppressed. See Code § 19.2-324.1 and Lockhart v. Nelson, 488 U.S. 33, 40-41 (1988) ("It is quite clear from our opinion in Burks[v. United States, 437 U.S. 1 (1978),] that a reviewing court must consider *all* of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause – indeed, that was the *ratio decidendi* of Burks – and the overwhelming majority of appellate courts considering the question have agreed." (internal citation omitted) (emphasis added)).

between appellant and David showed that appellant wanted to have sexual intercourse with Jane, that Jane was not reciprocating, and that David and appellant thought that plying Jane with alcoholic drinks would help ensure that Jane would have sexual intercourse with appellant. Kristina testified that Jane and appellant were alone at Jane's house while David took Kristina home. Kristina also testified that David – when he returned to Jane's house to retrieve appellant – texted Kristina a message that read, "They're fucking[.]" Jane testified that she did not give appellant permission to touch her or engage in sexual intercourse with her. Jane testified that she remembered appellant carrying her upstairs to her room and that she later felt appellant's penis inside of her vagina.[11]

In this case, a rational factfinder certainly could have found appellant guilty of rape and aggravated sexual battery because appellant's statements of confession to the police were corroborated by physical evidence, Kristina's testimony, Jane's testimony, and various text messages admitted at trial.

### III. Conclusion

Appellant was subject to custodial interrogation after he was served with a search warrant during the interview that required the swabbing of his penis and his mouth, he was accused of criminal wrongdoing by the detective, and his repeated requests to leave went unanswered in such a way as to make a reasonable person think that he could not leave. However, until the point of custodial interrogation, appellant's statements to police were voluntary. The statements that

---

[11] Appellant asserts that Jane's testimony was fundamentally incredible. Appellant relies on the fact that Jane provided multiple accounts of that evening and the fact that Jane testified on cross-examination that Jane was "pretty sure" that appellant was the perpetrator, but that she was "not positive." However, when it comes to a question of the sufficiency of the evidence on appeal and the credibility of the witnesses, we note that the credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented. Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995).

appellant made and the apology note that appellant wrote *after* he was subject to custodial interrogation must be suppressed. It was error for the trial court to admit those non-Mirandized statements at trial, and we cannot see how that error could be said to be harmless beyond a reasonable doubt, given appellant's stunning confession (after repeated denials and changing his story multiple times), his written apology note to Jane, and the Commonwealth's emphasis on his confession in its closing argument to the jury. Given the Supreme Court's decision in Zektaw, 278 Va. 127, 677 S.E.2d 49, it is clear that such error is not harmless beyond a reasonable doubt. Appellant did not sufficiently preserve his argument that he was entitled to put on expert testimony regarding the *voluntariness* of his confession. In addition, the trial court did not abuse its discretion in denying appellant a rape shield hearing. Finally, the evidence actually admitted at trial was sufficient to convict appellant of rape in violation of Code § 18.2-61 and of aggravated sexual battery in violation of Code § 18.2-67.3. Therefore, there is no double jeopardy prohibition precluding a new trial for rape and aggravated sexual battery.

For the foregoing reasons, we reverse appellant's convictions for rape and aggravated sexual battery and remand for a new trial if the Commonwealth is so inclined.

Affirmed in part, and reversed and remanded in part.