COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Malveaux and Senior Judge Frank
Argued at Newport News, Virginia

UNPUBLISHED

JAMES L. DIGGS

v.       Record No. 2125-16-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
JANUARY 30, 2018

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Wilford Taylor, Jr., Judge

Stephen K. Smith for appellant.

Aaron J. Campbell, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

James L. Diggs ("appellant") appeals his conviction for attempted rape accomplished

through the use of the victim's mental incapacity or physical helplessness, in violation of Code

§§ 18.2-61(A)(ii) and -67.5.[1]  On appeal, he argues that the trial court erred in denying his

motion to suppress his statements because he made the statements during a custodial

interrogation conducted without Miranda warnings, and his statements were not voluntary.

Appellant further argues that the trial court erred in denying his motion to strike, because the

Commonwealth's evidence was insufficient to prove that the complaining witness suffered

mental incapacity at the time of the offense or that appellant possessed the specific intent to

commit rape.  For the reasons that follow, we disagree and affirm the judgment of the trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant was also indicted on a second count of the same offense.  The trial court
granted his motion to strike with respect to the second charge.

I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts [are] stated in the light most favorable to the Commonwealth, the prevailing party at trial." Scott v. Commonwealth, 292 Va. 380, 381, 789 S.E.2d 608, 608 (2016) (citation omitted). "We also accord the Commonwealth the benefit of all inferences fairly deducible from the evidence." Muhammad v. Commonwealth, 269 Va. 451, 479, 619 S.E.2d 16, 31 (2005).

On March 15, 2015, both appellant and W.F. were patients at Riverside Behavioral Center in Hampton ("Riverside"). Appellant is hydrocephalic, suffers from emotional and psychiatric problems, and has a ninth grade education. He had been committed to Riverside by a magistrate after he attempted suicide, and at the time of the offense had been a patient for nearly two weeks.

W.F., a female, was twenty-five years old at the time of the offense. Her mother testified that W.F. suffers from tuberous sclerosis and other conditions that affect her physical and cognitive abilities and her emotional state. According to her mother, W.F.'s mental and emotional condition varies daily and "[s]ome days she . . . couldn't tell the difference [between] right [and] wrong." W.F. graduated from high school with a special education diploma, but lives at home and has never been able to work. W.F.'s mother testified that W.F. was at Riverside for "stabilization" due to her premenstrual dysphoric disorder.[2] Because of that disorder, W.F. "would go off every time she would have a [menstrual] cycle, so she would go [to Riverside]."

---

[2] Premenstrual dysphoric disorder, or PMDD, is characterized by "the expression of mood lability, irritability, dysphoria, and anxiety symptoms that occur repeatedly during the premenstrual phase of the [menstrual] cycle," which "may be accompanied by behavioral and physical symptoms." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 172 (5th ed. 2013). A PMDD diagnosis requires that its "[s]ymptoms must be associated with clinically meaningful distress and / or an obvious and marked impairment in the ability to function socially or occupationally in the week prior to menses." Id. at 174.

During these admissions, W.F. would remain at Riverside for anywhere from three to seven days.

Dr. Jeffrey Morse, a psychiatrist, had been treating W.F. for approximately seven years by March 2015. He testified that tuberous sclerosis is a congenital condition which has various effects, both mental or emotional and physical. One of its possible effects is "[m]ental retardation." Morse testified that W.F. also has a seizure disorder or epilepsy and that she experiences episodes of hallucinations and delusions, mood swings, and agitation and aggression. Morse stated that when W.F. experiences "an episode of psychosis or mood, her condition deteriorates . . . [s]he's not able to function." Morse opined that W.F. functions at about the age level of an eight to ten year old, with ten "the highest level" of function. He also opined that the time of the offense, W.F. was functioning at about the level of a ten year old and that her limited mental abilities would have affected her ability to make appropriate decisions. Morse did not examine W.F. on March 15, 2015 or treat her during that particular stay at Riverside, although he did have some of W.F.'s records from that admission.

Amanda Ketchen, a psychiatric technician at Riverside, testified that on March 15 she saw appellant and W.F. sitting side by side in a common room. Appellant had his arm around W.F. and was whispering in her ear. Ketchen entered the common room and told appellant to remove his arm from around W.F. because Riverside patients were not supposed to touch each other. Ketchen had to intervene with appellant in this fashion at least three times. W.F. "was sitting there . . . [without] saying anything," but on one occasion she "got a little bit loud and . . . disagreed" with Ketchen's attempt to separate her and appellant.

Later that day, Ketchen was making rounds when she saw that appellant and W.F. were no longer in the common room. She went to appellant's room to look for them. There, she found W.F. sitting on appellant's bed with her pants pulled down to her thighs. Appellant was

standing near the door, and although he was clothed, his clothing appeared to be "in a little bit of disarray." Ketchen reprimanded appellant and W.F. for their conduct and told W.F. to accompany her out of appellant's room.

W.F.'s mother spoke with her by phone every day while W.F. was at Riverside. When she spoke with W.F. on March 15, she became alarmed by what W.F. said to her. W.F.'s mother called the nurse's station and asked them what had happened to W.F. She then proceeded to Riverside, where the police had already arrived.

Detective Michael Benjamin of the Hampton Police Division visited Riverside on March 15 to investigate an alleged sexual assault. Benjamin asked Riverside staff if they could contact appellant to see if he would be willing to be interviewed by police. Staff facilitated the meeting and directed Benjamin to a room where appellant was seated. Before asking appellant any questions, Benjamin, who took notes throughout the interview, advised appellant that "this was a consensual interview and I just wanted to get his version of events. . . . I wanted him to be aware of the fact he was not under arrest, he was free to leave, and he did not have to answer any questions if he didn't want to." Appellant was cooperative and indicated to Benjamin that he understood. He spoke with Benjamin for twenty to thirty minutes and at no time said that he did not want to speak any further or that he wanted an attorney present.

Appellant told Benjamin that he had met W.F. at breakfast that morning and "the chemistry was overwhelming." Appellant said W.F. asked him if he wanted to be her boyfriend, but he told Benjamin that he "didn't take it serious[ly] . . . [s]he's a mental patient" and that he "was just feeding into the role play." When they went to appellant's room, he and W.F. began kissing and undressing and W.F. removed her pants. Appellant told Benjamin that he tried to penetrate W.F.'s vagina with his penis, but was unsuccessful despite rubbing his penis against her in an effort to stimulate lubrication. He grew tired of the effort, and when someone knocked

at the door, appellant and W.F. pulled their clothes back on. Appellant told Benjamin that W.F. "wanted that shit."

Anne Kennedy, a sexual assault nurse examiner in Riverside's emergency department, testified that she examined W.F. on March 15. She noted injuries to W.F.'s vagina, specifically an abrasion to the fossa area. She explained that such abrasions are common "mounting injuries," which may occur when the penis enters the vagina. The injury constituted a break in the skin, which could have been caused by penetration or "any kind of blunt [force] trauma." Kennedy also noted W.F.'s "mental slowness or disability" during the examination. W.F. "was able to answer questions but . . . didn't understand what [Kennedy] was asking, [and] she would answer inappropriately."

Appellant was indicted for attempted rape, in violation of Code §§ 18.2-61(A)(ii) and -67.5. Prior to trial, appellant moved to suppress his statements to Detective Benjamin. He argued that his Fifth and Sixth Amendment rights were violated because Detective Benjamin failed to advise him of his Miranda rights before questioning him. Appellant maintained that since he was not free to leave Riverside—a "locked" facility—his interview with Benjamin was a custodial interrogation. Further, appellant argued, even if the interview was noncustodial in nature, the circumstances surrounding it—appellant's emotional and mental disabilities, his commitment to Riverside following a suicide attempt, and the fact that he was on medication— would call into question the voluntariness of his statements.

At the suppression hearing, appellant initially testified that Benjamin told him he was not under arrest and could leave. However, he also specifically stated that Benjamin did not tell him that he was not under arrest. Appellant further testified that although he told Benjamin he did not feel comfortable talking with him with no one else present, Benjamin "charmed" him and appellant "eventually talked to him after he used his expertises [sic] on me."

- 5 -

The trial court denied the motion to suppress. It found that although appellant had been committed to Riverside under a court order, that commitment was the consequence of action by "another governmental entity—he was not there by virtue of the police," which is "what's envisioned with . . . Miranda." Appellant, the trial court found, "could have left the [interview] room." With respect to the voluntariness of appellant's statements, the trial court concluded from appellant's testimony that he was both extremely intelligent and familiar with Miranda. Although appellant testified that he did not feel comfortable with the interview, the trial court found that Detective Benjamin told appellant he was not under arrest and noted that appellant testified that he was told he was free to leave. Thus, the trial court concluded that appellant knew that he did not have to say anything to police. Further, the trial court found that there was no evidence appellant was taking any medication that would have impaired his ability to refuse to answer Benjamin's questions.

During his bench trial, appellant moved to strike the evidence of attempted rape. He argued there was no evidence that appellant specifically intended to rape W.F. and that the evidence supported a consensual encounter. Appellant also argued that there was no evidence that W.F. was mentally incapacitated at the time of the alleged rape. The trial court denied the motion.

At trial, appellant testified on his own behalf that W.F. did not seem to him like a ten year old, "talk[ed] like a grown woman," and called her mother from a pay phone in Riverside and put him on the line with her. Appellant stated that he and W.F. were mutually affectionate and "clinging to each other" throughout March 15 and that W.F. claimed him as her boyfriend and came to his room in search of sex. Appellant specifically denied ever attempting to put his penis in W.F.'s vagina. Further, he testified that "[e]verything was consensual" and that although he wanted to have sex with W.F., "[w]e never got the chance to do anything."

- 6 -

Appellant was convicted of attempted rape accomplished through the use of W.F.'s mental incapacity or physical helplessness, in violation of Code §§ 18.2-61(A)(ii) and -67.5. This appeal followed.

## II. ANALYSIS

### A. Motion to Suppress

Where a trial court has denied a motion to suppress, "[t]o prevail on appeal [an appellant] bears the burden to 'show that the trial court's denial . . . , when the evidence is considered in the light most favorable to the prosecution, was reversible error.'" Ford v. Commonwealth, 55 Va. App. 598, 604, 687 S.E.2d 551, 554 (2010) (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003)). "Although we review the trial court's application of the law *de novo*, we defer to the trial court's findings of fact taking care 'both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" Id. at 605, 687 S.E.2d at 554 (citation omitted) (quoting Malbrough v. Commonwealth, 275 Va. 163, 169, 655 S.E.2d 1, 3 (2008)). "Thus, we must give 'deference to the factual findings of the trial court' and 'independently determine' whether those findings satisfy the requirements of the [Constitution].'" Id. (quoting Kyer v. Commonwealth, 45 Va. App. 473, 479, 612 S.E.2d 213, 217 (2005) (*en banc*)). "We consider the evidence adduced at the hearing on the motion to suppress as well as the evidence adduced at trial." Id.

Appellant argues that the trial court erred in denying his motion to suppress his statements to police because Detective Benjamin subjected him to a custodial interrogation without first advising him of his Miranda rights, in violation of his rights under the Fifth and Sixth Amendments. He maintains that he was "in custody" at the time of his interview with Detective Benjamin, because he was "being held against his will by a magistrate's temporary

- 7 -

detention order in a psychiatric hospital where all of the doors are locked and patients are not free to leave." Thus, he argues, a reasonable person would not have believed that he was free to leave the police interview and <u>Miranda</u> warnings were required.

"[P]olice officers are not required to administer <u>Miranda</u> warnings to everyone whom they question. . . . <u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" <u>Bailey v. Commonwealth</u>, 259 Va. 723, 745, 529 S.E.2d 570, 583 (2000) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)). "The question of 'whether a suspect is "in custody" under <u>Miranda</u> is determined by the circumstances of each case, and the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" <u>Aldridge v. Commonwealth</u>, 44 Va. App. 618, 642, 606 S.E.2d 539, 551 (2004) (quoting <u>Harris v. Commonwealth</u>, 27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998)). "That determination 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" <u>Id.</u> (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)). "Accordingly, 'if a reasonable person in the suspect's position would have understood that he or she was under arrest, then the police are required to provide <u>Miranda</u> warnings before questioning.'" <u>Id.</u> (quoting <u>Harris</u>, 27 Va. App. at 564, 500 S.E.2d at 262).

> The circumstances . . . determining whether a suspect was "in custody" include: "(1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual."

<u>Id.</u> (quoting <u>Harris</u>, 27 Va. App. at 565, 500 S.E.2d at 262). No one factor is dispositive. <u>Id.</u>

Appellant's argument that he was "in custody" for <u>Miranda</u> purposes simply due to his civil commitment for psychological reasons is without merit. The relevant question is not whether a reasonable person would believe that he was not free to leave a police interview because it occurred in a mental health facility to which he had been civilly committed, but rather, under the totality of the circumstances, whether police subjected him to "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."[3] <u>Id.</u> (quoting <u>Harris</u>, 27 Va. App. at 564, 500 S.E.2d at 262).

Here, the trial court did not err when it found that appellant was "not [at Riverside] by virtue of the police." Nor did the court err when it found that appellant could have left the interview room. Detective Benjamin testified that he told appellant that he was not under arrest, did not have to answer any of his questions, and was free to leave the interview at any time. Appellant initially testified that he was told he was not under arrest and could leave. Although he then testified that Benjamin never told him he was not under arrest, the trial court, as trier of fact, was "not required to accept [appellant's] evidence in its entirety, but [was] free to believe or disbelieve, in whole or in part, the testimony of [appellant]." <u>English v. Commonwealth</u>, 43 Va. App. 370, 371, 598 S.E.2d 322, 323 (2004).

Further, regarding the factors quoted above, the record supports the finding that Benjamin merely requested the interview with appellant through a third party—Riverside staff—whom Benjamin asked to "see *if* [appellant would] be willing to do an interview." It is also clear from

---

[3] We note that the institutional setting of a police interview is not dispositive on the question of whether such an interview rises to the level of a custodial interrogation and that non-custodial interrogations have occurred even in the context of interviews conducted in jails and police stations. <u>See, e.g.</u>, <u>Howes v. Fields</u>, 565 U.S. 499, 502-03 (2012) (finding no custodial interrogation where two sheriff's deputies interviewed inmate in a jail conference room for five to seven hours); <u>Pruett v. Commonwealth</u>, 232 Va. 266, 270-72, 351 S.E.2d 1, 3-5 (1986) (finding no custodial interrogation where suspect was interviewed at police station for over an hour but was told he was neither under arrest nor a suspect).

the record that appellant was interviewed by a single officer in a neutral setting. Additionally, the record contains no evidence that Benjamin subjected appellant to any physical restraint, and the interview lasted only 20 to 30 minutes. Viewing the totality of these circumstances in the light most favorable to the Commonwealth, a reasonable person in appellant's position would not have believed that he was under arrest or that his freedom was so restricted as to render him "in custody" by police. Thus, appellant was not subject to a custodial interrogation and no Miranda warnings were required prior to Detective Benjamin's interview.

Appellant also argues that the trial court erred in denying his motion to suppress because his statements were not voluntarily made. In addition to the fact that he was not given Miranda warnings, appellant points to a number of other factors in support of this contention. He notes that despite his limited educational attainments and his history of psychiatric problems and commitments, Benjamin never inquired about his educational background, mental condition, or whether he was taking any medications. Further, when appellant was interviewed by Benjamin, he was still involuntarily committed as a patient at Riverside.

"Voluntariness is a question of law, subject to independent appellate review." Avent v. Commonwealth, 279 Va. 175, 195, 688 S.E.2d 244, 255 (2010) (quoting Midkiff v. Commonwealth, 250 Va. 262, 268-69, 462 S.E.2d 112, 116 (1995)). "The test to be applied in determining voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" Id. (quoting Midkiff, 250 Va. at 268, 462 S.E.2d at 116). "In determining whether a defendant's will has been overborne, courts look to 'the totality of all the surrounding circumstances,' including the defendant's background and experience and the conduct of the police." Id. (citation omitted). To make such a determination, a court should consider "the defendant's age, intelligence, mental and physical condition,

background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." Washington v. Commonwealth, 43 Va. App. 291, 302, 597 S.E.2d 256, 262 (2004) (quoting Bottenfield v. Commonwealth, 25 Va. App. 316, 323, 487 S.E.2d 883, 886 (1997)). Further, "some level of coercive police activity must occur before a statement . . . can be said to be involuntary." Id. at 303, 597 S.E.2d at 262 (quoting Commonwealth v. Peterson, 15 Va. App. 486, 488, 424 S.E.2 722, 723 (1992)). "In considering the conduct of the police, we 'must consider the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation.'" Id. (quoting Terrell v. Commonwealth, 12 Va. App. 285, 291, 403 S.E.2d 387, 390 (1991)).

This argument concerning voluntariness is also without merit. In the instant matter, the trial court found, based upon appellant's own testimony, that he was extremely intelligent and acquainted with Miranda rights. The trial court also found that there was no evidence that any medication impaired appellant's ability to refuse to answer Benjamin's questions. The record supports these findings and the trial court's conclusion that appellant knew that he did not have to say anything to police. In addition, for a suspect's statement to be found involuntary in nature, some level of coercive police activity must occur, and the record is devoid of evidence of such coercion. The record contains no evidence of threats to appellant by police. With respect to police trickery, deceit, or psychological pressure, the only such evidence in the record consists of appellant's testimony that Benjamin "charmed" and "used [his] expertises [sic]" on him to convince him to talk. Considering the totality of the circumstances in the light most favorable to the Commonwealth, the trial court did not err in finding that appellant's statements to Detective Benjamin were made freely and without constraint, and without appellant's will having been overborne and his capacity for self-determination critically impaired.

- 11 -

Because appellant fails to demonstrate reversible error by the trial court, either with respect to its finding that no Miranda warnings were required before Benjamin's interview with appellant or with respect to its finding that appellant's statements were voluntarily given, we affirm the trial court's denial of appellant's motion to suppress.

### B. Motion to Strike

"When considering a challenge to the sufficiency of evidence on appeal, we review the evidence in the light most favorable to the prevailing party at trial and consider all inferences fairly deducible from that evidence." Dunne v. Commonwealth, 66 Va. App. 24, 26, 782 S.E.2d 170, 171 (2016) (quoting Jones v. Commonwealth, 276 Va. 121, 124, 661 S.E.2d 412, 414 (2008)). In conducting our inquiry, "the relevant question is, after reviewing the evidence in the light most favorable to the [Commonwealth], whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63 (2010); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979). We "defer to the findings of fact made by . . . a trial judge at a bench trial if there is evidence to support them and will not set a judgment aside unless it appears from the evidence that the judgment is plainly wrong." Id.; see also Code § 8.01-680. Our deference "applies not only to findings of fact, but also to any reasonable and justified inferences the fact-finder may have drawn from the facts proved." Id. at 676, 701 S.E.2d at 63-64. Further, "circumstantial evidence may be more compelling and persuasive than direct evidence, and when convincing, it is entitled to as much weight as direct evidence." Booker v. Commonwealth, 61 Va. App. 323, 335-36, 734 S.E.2d 729, 735 (2012) (quoting Bridgeman v. Commonwealth, 3 Va. App. 523, 526, 351 S.E.2d 598, 600 (1986)).

Appellant argues that the trial court erred in denying his motion to strike because the evidence was insufficient to prove that at the time of the offense W.F. suffered mental incapacity

as defined by Code § 18.2-67.10. He contends that although W.F.'s psychiatrist, Dr. Morse, testified that W.F. functioned at the level of a ten year old and that her condition would impact her ability to make appropriate decisions, Dr. Morse did not examine W.F. on March 15, 2015 or at any time during that stay at Riverside. Appellant also relies upon his own testimony that W.F. did not appear to him to function at the level of a ten year old, was able to call her mother from a Riverside pay phone, and came into his room wanting sex.

Code § 18.2-67.10(3) defines "mental incapacity," for the purposes of evaluating alleged sexual assaults, as "that condition . . . existing at the time of [the] offense . . . which prevents the complaining witness from understanding the nature or consequences of the sexual act involved in such offense and about which the accused knew or should have known."[4] Thus, in order to convict a person of violating Code § 18.2-61(A)(ii), the Commonwealth must prove that at the time of the offense, the victim "did not understand the nature and consequences of" sexual intercourse. Adkins v. Commonwealth, 20 Va. App. 332, 342, 457 S.E.2d 382, 387 (1995).

Understanding the nature or consequences of sexual intercourse "can range from a simple understanding of how the act . . . is physically accomplished together with an understanding that . . . pleasure may accompany the act," to "a thorough and comprehensive understanding of the complex psychological and physiological 'nature' of [sexual intercourse] and that . . . the act may have dire familial, social, medical, physical, economic, or spiritual consequences." Id. at 344-45, 457 S.E.2d at 388. We have previously held that "[t]he range of intellectual functioning among the mentally impaired and mentally retarded varies widely" and that Code § 18.2-61(A)(ii) "was not designed to unfairly punish the sexual partners of those . . . who have a basic understanding of the act [or] consequences of sexual intercourse and are capable of making

---

[4] Appellant does not challenge the sufficiency of the evidence that he knew or should have known of W.F.'s condition.

a volitional choice to engage . . . in such conduct." Id. at 345, 457 S.E.2d at 388. Thus, "[w]hen a mentally impaired or mentally retarded person has sufficient cognitive and intellectual capacity to comprehend or appreciate that [they are] engaging in intimate or personal sexual behavior which later may have some effect or residual impact upon [them], . . . [their] . . . partner, or upon others," that person lacks a "mental incapacity" as defined by Code § 18.2-67.10(3). Id. at 345-46, 457 S.E.2d at 388. Consequently, a fact finder may not simply "infer from proof of general mental incapacity or retardation or an IQ range or mental age that a victim is prevented or unable to understand the nature [or] consequences of a sexual act." Id. at 346, 457 S.E.2d at 389. Instead, "[i]t is the confluence of IQ (or mental age) *and* adaptive skills that are relevant to the establishment of mental incapacity [as defined by Code § 18.2-67.10(3)]. . . . 'Adaptive functioning includes an individual's social skills, communication skills, daily living skills, personal independence, and self[-]sufficiency.'" Sanford v. Commonwealth, 54 Va. App. 357, 364, 678 S.E.2d 842, 845 (2009) (quoting Elizabeth J. Reed, Criminal Law and the Capacity of Mentally Retarded Persons to Consent to Sexual Activity, 83 Va. L. Rev. 799, 801 (1997)). Also, "[n]othing in the statutory definition . . . limits the definition of 'mental incapacity' to a permanent condition. . . . [T]he definition refers to a condition existing 'at the time of an offense' and does not limit its scope to non-transitory conditions." Molina v. Commonwealth, 272 Va. 666, 673, 636 S.E.2d 470, 474 (2006).

Our analysis is informed by our decision in Sanford v. Commonwealth, 54 Va. App. 357, 678 S.E.2d 842. In Sanford, we affirmed a conviction for forcible sodomy, in violation of Code § 18.2-67.1(A)(2), where the victim lacked the mental capacity to understand the nature and consequences of cunnilingus. Id. at 365, 678 S.E.2d at 846. Expert testimony established that the sixteen-year-old victim had a "very, very low" I.Q. of 46, "close[] to the severe mental retardation range." Id. at 360, 678 S.E.2d at 843. Further, "her '*ability to assess cause-effect*

- 14 -

*relationships in social interaction . . . was zero . . . the lowest,'"* and the victim was incapable of living independently and required "'constant supervision.'" Id. at 361, 365, 678 S.E.2d at 844, 846. While the victim's mother testified that she had discussed sex with her daughter "in a general sense," she also stated that she had never explained the specific sex act at issue. Id. at 361, 678 S.E.2d at 844. This Court, in determining that the victim was mentally incapacitated as defined by Code § 18.2-67.10(3), noted that she could not live independently and required constant supervision, even in her home. Id. at 365, 678 S.E.2d at 846.[5]

Here, a rational trier of fact, considering the evidence in the light most favorable to the Commonwealth and affording it all reasonable inferences deducible from that evidence, could have found that at the time of the offense W.F. was mentally incapacitated as defined by Code

---

[5] Cf. Adkins v. Commonwealth, 20 Va. App. 332, 457 S.E.2d 382 (1995), and White v. Commonwealth, 23 Va. App. 593, 478 S.E.2d 713 (1996). In Adkins, we reversed a conviction for rape in violation of Code § 18.2-61(A)(ii) after finding that the Commonwealth failed to prove the mental incapacity of the victim. Adkins, 20 Va. App. at 347, 457 S.E.2d at 389. Although the evidence supported that the sixteen-year-old victim only had a mental age of 10.4 years, the victim testified that "she 'made love' to the [defendant], that she knew that she could get pregnant from 'making love' and could catch AIDS, that she had had sex education classes in school, and she used the words 'penis' and 'vagina' when describing the act of sexual intercourse." Id. at 346-47, 457 S.E.2d at 389. Her testimony also showed that "she was the person who conceived the notion of having sexual intercourse . . . and initiated the sexual liaison." Id. at 347, 457 S.E.2d at 389. Further, the victim's mother testified that she had explained the consequences of having sexual intercourse to the victim and that she "at least partially understood these discussions." Id. at 338, 457 S.E.2d at 385. The victim's mother also testified that her daughter knew how to take care of herself and how to go shopping. Id.

In White, this Court again reversed a conviction for rape in violation of Code § 18.2-61(A)(ii) after finding that the Commonwealth failed to prove the mental incapacity of the victim. White, 23 Va. App. at 598, 478 S.E.2d at 715. The fourteen-and-a-half-year-old victim was "at the upper end of the educable mentally retarded range," but her adaptive skills were substantial. Id. at 597, 478 S.E.2d at 714. Expert testimony established that when she was given achievement tests two years prior to the offense, "compared to other children her age . . . , her scores in communication, daily living skills and socialization domains were all well above the mentally retarded range." Id. Further, the victim had advanced with her peers from middle to high school. Id.

Distinguishing Adkins and White, the Sanford Court noted that the "contrast between the victim's adaptive functioning" and that of the victims in those cases was "striking, and telling." Sanford, 54 Va. App. at 365, 678 S.E.2d at 846.

§ 18.2-67.10(3). Dr. Morse, although he did not evaluate or treat W.F. on the date of the offense, testified that he had some of her records from her stay at Riverside and had treated her for the preceding six to seven years. He opined that she functions at the mental level of an eight to ten year old. W.F.'s mother testified that her daughter would, on some days, be unable to tell the difference between right and wrong. Like the victim in Sanford, W.F. is unable to live independently. Nor has she ever been able to hold a job, despite having once earned a special education diploma. W.F.'s adaptive skills for daily living, personal independence, self-sufficiency, and communication were markedly impaired on the day of the attempted rape. On that day, W.F. was a patient at Riverside because her already limited adaptive skills, which precluded her from working or living outside her mother's home, had been further eroded by the periodic effects of her PMDD and her resulting need for in-patient psychological stabilization. Anne Kennedy, the nurse who examined W.F. for indicia of sexual assault on the day of the offense, testified that W.F. did not understand what Kennedy was asking her and answered inappropriately. A rational trier of fact could infer from this evidence of W.F.'s limited adaptive functioning, together with the evidence of her general mental incapacity, that on March 15, 2015, W.F.'s condition prevented her from "comprehend[ing] or appreciat[ing]" that she was "engaging in intimate or personal sexual behavior which later may have [had] some effect or residual impact upon [her], upon [appellant], or upon others." Adkins, 20 Va. App. at 346, 457 S.E.2d at 388. Thus, the trial court's denial of appellant's motion to strike on the ground of insufficient evidence of mental incapacity was not plainly wrong.[6]

---

[6] Appellant also argues that the trial court erred in denying his motion to strike because the evidence was insufficient to prove that he possessed the specific intent to commit rape. He maintains that he lacked the requisite intent because he never intended to have non-consensual intercourse with W.F. This argument is unpersuasive. Appellant was convicted of attempted rape, in violation of Code §§ 18.2-61(A)(ii) and -67.5, for attempting to engage in sexual intercourse with W.F. through the use of her mental incapacity or physical helplessness. "[W]hen an individual is mentally incapacitated under Code § 18.2-67.10(3), the individual is

- 16 -

## III.  CONCLUSION

We hold that the trial court did not err in denying appellant's motion to suppress his statements made to police, as he was not subjected to custodial interrogation and his statements were given voluntarily.  Further, the evidence was sufficient to establish that the victim was mentally incapacitated as defined by Code § 18.2-67.10(3) and that appellant possessed the specific intent to commit rape.  Thus, we affirm the trial court's judgment finding appellant guilty of attempted rape, in violation of Code §§ 18.2-61(A)(ii) and -67.5.

Affirmed.

---

incapable of legally consenting to the [sexual act], on the grounds that '[c]onsent without understanding is no consent at all.'"  Nicholson v. Commonwealth, 56 Va. App. 491, 510, 694 S.E.2d 788, 797 (2010) (quoting Molina v. Commonwealth, 47 Va. App. 338, 358, 624 S.E.2d 83, 92 (2006)).  Because we affirm the trial court's finding that W.F. was mentally incapacitated at the time of the offense, as defined by Code § 18.2-67.10(3), W.F. was not legally capable of consenting to engage in sexual acts with appellant.  Thus, appellant's contention that any sexual activity that he intended to engage in with W.F. was based on mutual consent is irrelevant.

Frank, J., concurring, in part, and dissenting, in part:

I concur in the majority opinion that the trial court did not err in denying appellant's motion to suppress. However, I respectfully dissent from the majority finding that the victim, W.F., did not have a basic understanding of the sexual act or consequences of sexual intercourse at the time of the incident.

The dispositive question before us is whether W.F.'s mental condition *at the time of the incident* prevented her from understanding either the nature or consequences of the sexual act. See White v. Commonwealth, 23 Va. App. 593, 596-97, 478 S.E.2d 713, 714 (1996) ("The Commonwealth's evidence regarding complainant's mental status two years after the offense is not evidence of complainant's mental status [on the date of the offense]."). The incident at issue here occurred on March 15, 2015, and the trial was held approximately eighteen months later on September 22, 2016.

W.F. did not testify at trial because her condition had deteriorated to the point that she could not feed, clothe, or bathe herself, and she required close supervision. Her psychiatrist, Dr. Morse, testified that W.F. was unable to function when she had a psychotic episode, which could last for several months. There was no evidence, however, of W.F.'s precise condition on March 15, 2015, the day of the incident. Dr. Morse did not see W.F. on the that day, nor had he treated her while she was at the Riverside facility. Dr. Morse said he last saw W.F. on May 11, 2016, at which time she was "relatively stable."

W.F.'s mother, B.H., testified that W.F.'s behavior in the home "varie[d] from day to day." On "some days [W.F. would] be really agitated" and "couldn't tell the difference from right from wrong." The reasonable inference from her testimony is that W.F. did not experience this kind of behavior every day. B.H. did not specify whether she was describing W.F.'s past or current behavior, and there was no evidence that on the day of the incident W.F. was

experiencing the behavior B.H. described. B.H. testified that she and W.F. spoke by telephone every day while W.F. was at the Riverside Center and that W.F. called her "multiple times." B.H. said W.F. telephoned her after the incident occurred and that as a result of their conversation, B.H. went to the center where she talked with W.F. about the incident.

Because the restriction in Code § 18.2-61(A)(ii) regarding sexual intercourse with a mentally incapacitated person was not meant to punish consensual sex between intellectually disabled adults, the fact finder may not "infer from proof of general mental incapacity or mental retardation or an IQ range or mental age" alone that a victim lacks mental capacity. Adkins v. Commonwealth, 20 Va. App. 332, 346, 457 S.E.2d 382, 389 (1995).

> It is the confluence of IQ (or mental age) *and* adaptive skills that are relevant to the establishment of mental incapacity. As one commentator has noted: "Intellectual functioning is measured by the intelligence quotient ('IQ'), which is obtained using standard intelligence tests. . . . Adaptive functioning includes an individual's social skills, communication skills, daily living skills, personal independence, and self sufficiency."

Sanford v. Commonwealth, 54 Va. App. 357, 364, 678 S.E.2d 842, 845 (2009) (quoting Elizabeth J. Reed, Criminal Law and the Capacity of Mentally Retarded Persons to Consent to Sexual Activity, 83 Va. L. Rev. 799 (1997)).

In Adkins, this Court reversed a rape conviction based upon mental incapacity. Adkins, 20 Va. App. at 347, 457 S.E.2d at 389. The victim was sixteen years old, had a mental age of 10.4 years, and possessed an IQ between 58 and 70. Id. at 338-39, 457 S.E.2d at 385. She could be left alone at home or go shopping by herself at a local mall. Id. at 337, 457 S.E.2d at 384. She had had sex education classes at public school, and she understood that one could become pregnant or get AIDS as a consequence of sexual intercourse. Id. at 346-47, 457 S.E.2d at 389. This Court thus held that the Commonwealth did not establish beyond a reasonable doubt that

the victim did not understand either the nature or consequences of the sexual act.  Id. at 347, 457 S.E.2d at 389.

Similarly, in White, this Court reversed a rape conviction based on mental capacity.  See White, 23 Va. App. at 598, 478 S.E.2d at 715.  There, the fourteen-year-old victim's test scores showed she was "educable mentally retarded," and her achievement "[s]cores in communication, daily living skills and socialization domains were all above the mentally retarded range, with a strength in socialization skills, achievement, overall adaptive behavior falling well within the low average range."  Id. at 597, 478 S.E.2d at 714.  Thus, the Commonwealth failed to show that the victim did not understand either the nature or consequences of the sexual act.  Id.

Both Adkins and White addressed not only the victims' mental deficiencies but also emphasized the victims' adaptive skills.  This Court distinguished Adkins and White in Sanford because the "victim's adaptive functioning" was strikingly different.  Sanford, 54 Va. App. at 365, 678 S.E.2d at 846.  The sixteen-year-old victim in Sanford had an IQ of 46, her "verbal, memory, and decisional functions" were those of a four year old, and she could not live independently and needed constant supervision.  Id.  The Court held the victim was mentally incapacitated and affirmed the defendant's forcible sodomy (cunnilingus) conviction.

In appellant's case, the description of W.F.'s condition *at the time of the trial* was closer to that of the victim in Sanford than the victims in Adkins and White.  However, the Commonwealth was required to prove W.F. was mentally incapacitated *at the time of the offense*.  See White, 23 Va. App. at 596-97, 478 S.E.2d at 714.  The trial took place eighteen months after the offense had occurred.  The Commonwealth's evidence did not establish that W.F.'s condition at trial was the same as her condition at the time of the offense.

Additionally, Dr. Morse testified W.F. experienced psychotic episodes that lasted for several months, but there was no testimony she was having a psychotic episode, hallucinations,

delusions, or seizures on March 15, 2015 that affected her thought process. Dr. Morse believed W.F. was functioning at the age of eight to ten years old at the time of the incident, but there was no additional evidence about W.F.'s IQ level or an assessment of her adaptive skills based on standardized tests. Both "IQ (or mental age) *and* adaptive skills . . . are relevant to the establishment of mental incapacity." Sanford, 54 Va. App. at 364, 678 S.E.2d at 845 (concluding that expert testimony that the victim's score on a test measuring her ability to assess cause-effect relationship in social interaction was "zero . . . the lowest" supported the trial court's finding that the victim lacked the requisite mental capacity).

Here, W.F. graduated from a local high school with a special education diploma, certainly an indication she had some cognitive skills and was able to follow instructions and complete the curriculum. W.F.'s mother testified that W.F. telephoned her "multiple times" while W.F. was at the Riverside Center and called her after the incident. Following their conversation, W.F.'s mother contacted the center to further inquire about the incident and then went to the center where she spoke with W.F. That W.F. told her mother what had happened indicated W.F. possessed communication skills at the time of the offense.

Dr. Morse testified W.F.'s mental limitations would affect her ability to make appropriate decisions, but, again, there was no evidence that, on the day of the incident, she could not, or did not, understand the nature or consequences of the sexual act. There was evidence that W.F. and appellant had a mutual attraction and were seen spending time together in the facility's community room. When a staff member admonished appellant and W.F. to stop touching each other, W.F. objected, indicating she understood the staff member's attempt to break up W.F.'s relationship with appellant. Further, after the staff member noticed appellant and W.F. were no longer in the community room, she went to appellant's room, knocked on the door, and immediately entered. W.F. was sitting on appellant's bed with her pants pulled down to her

thighs. After being told that it was not acceptable for men and women to go into each other's rooms at the facility, W.F. pulled up her pants and left the room with the staff member. This act reflected W.F.'s understanding that her conduct with appellant was inappropriate and further indicated that she exhibited social skills.

The trial court found that W.F. "had a mental incapacity." Relying on the testimony of Dr. Morse that W.F. was functioning at eight to ten years old, the court concluded W.F. "was not able to consent to having sex with [appellant]." However, W.F.'s mental age is not the dispositive factor. "IQ or mental age alone, while evidence of mental incapacity, does not necessarily establish that incapacity, within the meaning of the statute." Sanford, 54 Va. App. at 363, 678 S.E.2d at 845. The trial court stated the testimony of the SANE nurse that W.F. was "slow mentally" "confirm[ed]" W.F.'s incapacity. But the nurse's testimony that W.F. did not understand the questions the nurse asked did not speak to whether W.F. understood the nature or consequences of the sexual act. There was no evidence regarding the questions the nurse asked or the responses W.F. gave.

As stated above, being "slow mentally" does not by itself establish mental incapacity. Rather, mental ability must be considered together with adaptive skills, including social, communication, and daily living skills. See Sanford, 54 Va. App. at 364, 678 S.E.2d at 845. The evidence here indicated that W.F. possessed social and communication skills at the time of the incident. No evidence was presented that W.F. could not feed or clothe herself while at the Riverside Center in March 2015. W.F.'s mother testified that W.F.'s condition had changed significantly since she had been at the facility and that at the time of trial, W.F. could not feed, bathe or dress herself. The reasonable inference from this evidence is that W.F. had daily living skills when the incident occurred.

The only evidence of W.F.'s "mental incapacity" at the time of the incident was the SANE nurse's characterization of W.F. as "slow mentally." Dr. Morse presented information about W.F.'s general condition, but he did not testify as to W.F.'s specific condition on the day of the incident. There is no basis to infer from this evidence, nor from W.F.'s mother's testimony, that W.F. was mentally incapacitated at the time of the incident. On the contrary, W.F., a high school graduate, exhibited adaptive communication and social skills. There is no evidence to support the trial court's finding of fact.

I conclude the evidence was insufficient to prove beyond a reasonable doubt that W.F. did not understand the nature or consequences of the sexual act at the time of the incident. I would reverse the judgment of the trial court and dismiss the indictment.